**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------X

**IN RE: NORTHWEST AIRLINES**                         :

                                                                       :     **Case No. 1:07-cv-07940 (SAS)**

     **GENERAL FOODS CREDIT CORP.,**           :
     **Appellant**                                             :

     **v.**                                                         :     **ORAL ARGUMENT REQUESTED**

     **NORTHWEST AIRLINES, INC.,**               :
     **Appellee**
                                                                       :

-------------------------------------------------------------X


**<u>BRIEF OF APPELLANT GENERAL FOODS CREDIT CORP.</u>**


            Andrew H. Schapiro
            David F. Abbott
            MAYER BROWN LLP
            1675 Broadway
            New York, NY  10019
            212-506-2500

            Stephen Sanders
            MAYER BROWN LLP
            71 S. Wacker Drive
            Chicago, IL  60606
            312-701-8464

            *Counsel for Appellant*
            *General Foods Credit Corp.*

            September 28, 2007

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ............................................................................. 1

SUMMARY OF ARGUMENT ............................................................................. 1

BACKGROUND ................................................................................................... 2

ARGUMENT ......................................................................................................... 8

I.    THE BANKRUPTCY COURT EXCEEDED ITS AUTHORITY AND
      IMPROPERLY PREJUDICED GFCC'S RIGHTS ......................................... 8

      A.    A Settlement Hearing Is a Summary Proceeding. .................................. 8

      B.    The Bankruptcy Court Improperly Adjudicated the Merits of GFCC's
            Claim ...................................................................................................... 10

            1. Northwest Improperly Sought to Use Its Settlement Hearing With
                BAE to Adjudicate GFCC's Separate Claim. ......................................... 11

            2.    GFCC Objected to Having Critical Issues Concerning Its Own
                  Claim Adjudicated in a Settlement Proceeding. ..................................... 13

            3.    The Bankruptcy Court Improperly Made Factual Findings and
                  Legal Conclusions Relating to GFCC's Claim ...................................... 14

            4.    The Bankruptcy Court's Decision Violated Clear Precedent. ............... 16

      C.    Regardless of Whether the Proposed Settlement Was Fair As to Northwest
            and BAE, It Was Unfair As to GFCC ..................................................... 17

II.   THE BANKRUPTCY COURT ERRED IN ITS INTERPRETATION OF THE
      OPERATIVE DOCUMENTS. ....................................................................... 18

      A.    GFCC's Right to Tax Indemnification Was Not Part of the Collateral
            Pledged for BAE's Benefit. ................................................................... 19

            1.    GFCC Was Not a Party to the Indenture. .............................................. 19

            2.    The Bankruptcy Court Confused GFCC's Equity Investment With
                  GFCC's Separate Contractual Right to Tax Indemnification. ............... 21

            3.    The Basic Economics of Leveraged Leasing Confirm That GFCC's
                  Rights Under the TIAs Were Not Pledged for BAE's Benefit. ............. 22

      B.    Northwest's Payment of a Compromised Amount in Settlement With BAE
            Does Not Eliminate its TIA Obligation to GFCC. .................................. 23

# TABLE OF AUTHORITIES

**Page**

## Cases

*AWECO, In re,*
  725 F.2d 293 (5th Cir. 1984) ................................................................. 18

*Burkett, In re,*
  329 B.R. 820 (Bankr. S.D. Ohio 2005)..................................................... 10

*Copeland v. Merrill Lynch & Co., Inc.,*
  47 F.3d 1415 (5th Cir. 1995) ................................................ 9, 10, 12, 14

*Cullen v. Riley,*
  957 F.2d 1020 (2d Cir.1992) ................................................................... 18

*Delta Air Lines, In re*, 370 B.R. 552 (Bkrtcy. S.D.N.Y.) ........................ 4, 24

*Devon Capital Mgmt., Inc., In re,*
  261 B.R. 619 (Bankr. W.D. Pa. 2001) ..................................................... 17

*Energy Co-op,. Inc., In re,*
  886 F.2d 921, 927 (7th Cir. 1989) ............................................................ 8

*Iridium Operating LLC, In re,*
  478 F.3d 452 (2d Cir. 2007) ................................................................... 17

*Orion Pictures Corp., In re*, 4 F.3d 1095, 1098-99 (2d Cir. 1993) ............. 9, 12,14, 16

*Protective Comm. for Indep. Stockholders of*
  *TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414 (1968) ......................... 8, 10, 17

*Saylor v. Lindsley,*
  456 F.2d 896 (2d Cir. 1972) (Friendly, C.J.)........................................... 8, 9

*W.T. Grant & Co., In re,*
  699 F.2d 599 (2d Cir.1983) (Friendly, J.)
  *cert. denied sub nom.*, 464 U.S. 822 (1983) ................................... 9, 14, 17

## Rules

Fed. R. Bankr. P. 3007 ............................................................................... 10

Fed. R. Bankr. P. 9014............................................................................... 8, 10

Fed. R. Bankr. P. 9019(a) .......................................................................... 7

## Treatises

James C. Ahlstrom, *et al*., "The Economics of Leveraged Leasing," in Ian Shrank & Arnold G. Gough Jr., eds., *Equipment Leasing-Leveraged Leasing* 4th ed.................................................. 4

William A. Macan IV & Michael G. Robinson, "Tax Aspects of Equipment Leasing," in Ian Shrank & Arnold G. Gough Jr., eds., *Equipment Leasing-Leveraged Leasing* 4th ed............ 22

Ian Shrank, "Documentation," in Ian Shrank & Arnold G. Gough Jr., eds., *Equipment Leasing-Leveraged Leasing* 4th ed................................................................................................. 4, 22

Mark A. Sternberg & Ross D. Taylor, "Leveraged Leasing from a Lender's Viewpoint," in Ian Shrank & Arnold G. Gough Jr., eds., *Equipment Leasing-Leveraged Leasing* 4th ed............ 22

## PRELIMINARY STATEMENT

General Foods Credit Corp. ("GFCC") was an equity investor in five commercial aircraft that were leased to Northwest Airlines ("Northwest") prior to Northwest's declaration of bankruptcy. By virtue of its equity investment in the aircraft, GFCC was entitled to certain tax benefits. Because such tax benefits represented the major source of GFCC's yield on its investment, GFCC obtained a separate contractual commitment from Northwest to indemnify it for loss of these benefits. After Northwest rejected the leases, GFCC filed a claim for indemnification.

In the course of settling a *different* claim with a *different* creditor, Northwest insisted that the bankruptcy court also effectively adjudicate GFCC's claim in the same proceeding. The bankruptcy court, failing to recognize the limits of its authority in a settlement hearing, acceded to Northwest's demand. The bankruptcy court wrongfully provided factual findings and legal conclusions that prejudiced GFCC's claim – a claim that was not before the bankruptcy court, and which the parties to the settlement had no authority to compromise. The bankruptcy court also erred in its interpretation of the tax indemnification agreement between Northwest and GFCC. GFCC thus moves to vacate the bankruptcy court's decision and to remand for proper consideration of GFCC's claim, as provided for by federal bankruptcy law, in a separate, contested proceeding.

## SUMMARY OF ARGUMENT

The bankruptcy court exceeded its authority by deciding disputed issues in a summary proceeding. In a settlement hearing, a bankruptcy court's role is limited to applying its business judgment to determine whether a settlement is fair and equitable. In this case, the bankruptcy court went far beyond this narrow mandate. It effectively adjudicated the merits of a *separate*

*and independent claim* held by a third party – GFCC.  In doing so, the bankruptcy court wrongfully prejudiced GFCC's right to have its own claim considered in its own contested proceeding, with the due process protections provided by federal bankruptcy law.

The bankruptcy court also erred in its interpretation of the operative documents in this case.  The court based its rulings on the crucial but mistaken premise that GFCC's right to indemnification by Northwest for certain tax benefits was part of a package of collateral that had been pledged for the benefit of the lender with whom Northwest was proposing to settle.  In fact, the operative documents make clear that GFCC's right to indemnification was a separate and distinct contractual right which was not pledged to anyone else.  Moreover, contrary to the bankruptcy court's understanding, Northwest's payment of a compromised amount in settlement with a different creditor could not have excused Northwest's separate and independent obligation to GFCC.

## **BACKGROUND**

This case arises out of Northwest's Chapter 11 bankruptcy.  The underlying claims involve transactions through which Northwest leased five Avro 146-RJ85A aircraft.  The transactions were "leveraged leases," which typically involve four entities in addition to the lessee: an "Owner Participant," one or more Lenders, and their respective trustees.

As Owner Participant, GFCC provided an equity investment in each transaction and, as the beneficial owner of the aircraft, was entitled to claim certain tax benefits (which would account for the bulk of the yield on its investment).  As the Lender, BAE Systems (Funding One) Limited ("BAE") provided debt financing to help acquire the aircraft.

The Owner Participant and the Lender typically create trusts and appoint trustees to carry out certain functions.  The Owner Trustee (in this case, Wells Fargo Bank Northwest, N.A.,

successor to First Security Bank, N.A.) acts on behalf of the Owner Participant: it received the equity invested by GFCC; borrowed from BAE the balance of the cost to purchase the aircraft; held title to the aircraft; and leased the aircraft to Northwest. The Indenture Trustee (in this case, U.S. Bank, N.A., successor to State Street Bank and Trust Co.) held the security interest in the aircraft on behalf of BAE.

A leveraged lease transaction involves numerous interlocking agreements, referred to collectively as the "operative documents," which create discrete and specific contractual rights. Three operative documents are pertinent here[1]:

■  a Lease between the Owner Trustee and the airline, under which Northwest agreed to pay rent for use of the aircraft;

■  an Indenture between the Owner Trustee and Indenture Trustee, under which certain assets of the Owner Trust – principally the aircraft and the right to receive certain rent payments under the Lease – were pledged to the Indenture Trustee as collateral for the benefit of the Lender; and

■  a Tax Indemnity Agreement ("TIA") between the airline and the Owner Participant, in which Northwest agreed to indemnify GFCC for loss of its anticipated tax benefits. Such a loss of tax benefits could be triggered by, for example, certain changes in the lessee's use of the aircraft, destruction of the aircraft, or, as in this case, default by the lessee and foreclosure against the aircraft.

Leveraged leasing has several distinctive features. *First*, the debt financing provided by the Lender is always non-recourse – meaning that in case of default by the lessee airline, the

---

[1]  Copies of a set of the operative documents referred to in this brief are contained in the record transmitted by the bankruptcy court. These documents are representative of all five transactions at issue in this case.

Indenture Trustee and Lender may look for repayment only to the collateral pledged by the Owner Trustee under the Indenture, not to the assets of any of the other parties. *See* James C. Ahlstrom, *et al*., "The Economics of Leveraged Leasing," in Ian Shrank & Arnold G. Gough Jr., eds., *Equipment Leasing-Leveraged Leasing* 4th ed. (hereinafter, *Leveraged Leasing*) § 6:2 ("The most important feature of the loan to the lessor is its non-recourse nature.")  The non-recourse nature of the debt makes it especially important to carefully identify exactly what assets have – and have not – been pledged as collateral by the Owner Trust.

*Second*, the Owner Participant's right to tax indemnification from the airline is a separate and independent contractual claim, usually referred to as an "Excluded Right" or "Excluded Payment."  Unlike the Owner Participant's equity investment, the Owner Participant's right to recover amounts due under the TIA is a debt obligation of the lessee.  It typically is *not* part of the collateral pledged under the Indenture, and is equal in priority to obligations under the Lease. *See* Ian Shrank, "Documentation," in *Leveraged Leasing* § 29:5.2[A] (explaining that the "scope of excluded payments is reasonably well standardized" and typically includes "any indemnities owed to the … owner participant"); *id*. § 29:3.3  (identifying one of these indemnities as "a special or income tax indemnity solely for the benefit of the owner participants against loss of some or all of the owner participants' anticipated tax benefits"); *id.* at 29:5.2[A] (indemnity claims are on a *pari passu* basis with those of the Lender and are not subordinated).

*Third*, if the lease ends prematurely, the lessee must pay liquidated damages in a form commonly referred to as Stipulated Loss Value ("SLV").  SLV includes (1) the outstanding debt

on the aircraft; (2) the Owner Participant's outstanding equity investment; and (3) the lessee's tax indemnity obligations to the Owner Participant under the TIA.[2]

After filing for bankruptcy, Northwest defaulted by rejecting the leases and ceasing to make rent payments necessary to service the debt. BAE then foreclosed on the aircraft, giving rise to two claims relevant here. BAE and U.S. Bank have submitted claims against Northwest under the Leases and Indentures. GFCC has submitted a separate claim against Northwest under the TIAs for the loss of its tax benefits.

On May 17, 2007, Northwest entered into a proposed Stipulation with BAE and U.S. Bank intending to settle BAE's rejection damage claim for approximately $68 million. The Stipulation also provided that settlement of this claim, plus the fair market value of the foreclosed-upon aircraft, would "constitute[] full payment and discharge of Stipulated Loss Value" under each prepetition lease. Stip. ¶ 2.

GFCC objected to the proposed Stipulation. GFCC argued that under the operative documents, the amount Northwest was proposing to pay to BAE must first be reduced by the amount Northwest owes to GFCC under the TIAs. GFCC Obj. at 7. Section 7 of the TIA provides that if an amount is "required to be paid" by Northwest as tax indemnification to GFCC, as it is in this case, GFCC will reduce SLV to account for such payment. TIA § 7.

GFCC previously had calculated the appropriate reduction to SLV and sent notices to Northwest, BAE, and U.S. Bank. None of these parties responded, so no SLV reduction was effected. Nor has Northwest filed any objection to GFCC's claim under the TIAs. In its

---

[2] *See In re Delta Air Lines*, 370 B.R. 552, 555 (Bkrtcy. S.D.N.Y. 2007) ("SLV can be calculated in different ways, but typically it is calculated (i) to permit the payoff of the remaining debt, and (ii) to allow the Owner Participant to earn an agreed-upon return through the date of termination. The calculation of SLV takes account of, among other things, the adverse tax consequences to the Owner Participant from the premature termination of the lease or other events.")

objection to the proposed Stipulation, GFCC explained that by negotiating a settlement with BAE while disregarding Section 7 of the TIA and ignoring GFCC's calculation of the reduction to SLV, Northwest was essentially proposing to overpay BAE by $30 million – the amount Northwest actually owes to GFCC under the TIAs.

GFCC emphasized that its primary concern in objecting to the proposed Stipulation was simply to protect its right to litigate its own claim in its own proceeding, and asked that any order approving the Stipulation expressly preserve GFCC's rights.  GFCC Obj. at 9-11.  The proposed Stipulation, GFCC explained, failed to recognize that GFCC's claims were predicated upon separate and independent contractual rights which could not be affected by any settlement.  *Id*. at 9.  Finally, GFCC noted that the sweeping and definitive language in the proposed Stipulation providing that BAE's allowed claim "shall not be subject to … any claims of any owner trustee or owner participant," Stip. ¶ 1, appeared to eliminate GFCC's exclusive right under the operative documents to demand, collect, and enforce an Excluded Payment such as the tax indemnity component of SLV.  GFCC Obj. at 12-13.

The bankruptcy court held a hearing on the Stipulation on July 26, 2007.  The hearing focused almost entirely, however, on the merits of GFCC's TIA claim against Northwest – despite GFCC's objections to having its own, independent claim effectively adjudicated in the course of a summary proceeding held to consider Northwest's settlement with a *different* creditor.

Northwest's counsel told the bankruptcy court that to approve the settlement and avoid exposing Northwest to the possibility of double payment, the court had no choice but to also decide the merits of GFCC's TIA claim at the same time.[3]  In response, GFCC's counsel noted

---

[3]  As Northwest's counsel stated:

that Northwest had not filed any objection to GFCC's claim, and made clear that GFCC was

appearing only for the purpose of protecting its own third-party rights. Tr. at 37-38.

Nonetheless, the bankruptcy judge pressed GFCC for its view on how to interpret the interplay of

two provisions in the TIA – one of the questions that would be at issue in a contested proceeding

on GFCC's claim.[4]

In its decision, the bankruptcy court undertook what it called a "painstaking analysis of

the agreements at issue," Dec. at 7, and made specific findings about disputed provisions of the

TIAs between Northwest and GFCC, *see id.* at 11-14. The court approved the Northwest-BAE

Stipulation based on its "ruling" that, contrary to GFCC's position, the payment Northwest was

proposing to make to BAE "does not have to be reduced" by the amount Northwest owes GFCC.

*Id.* at 16. Under the Court's interpretation of the TIAs, Northwest's payment to BAE of an

amount which the settling parties *deemed* to be "full payment and discharge" of SLV would

relieve Northwest of its tax indemnity obligations to GFCC. *Id.* at 11. These rulings effectively

foreclosed GFCC's separate and independent TIA claim.

---

I do believe, however, Your Honor, that it must be decided today whether [GFCC is] owed any amount under the tax indemnification agreement; and [whether] because of that, SLV should be reduced[,] because if Your Honor does not decide that today, then Northwest is – either Northwest is exposed to double payment, or BAE is exposed to clawback, and I know that we are not prepared to take that risk.

Tr. at 11.

[4] As the bankruptcy judge said at one point, "I think we should get to the stipulation eventually, but my question went more to what in the [TIA] says that Section 7 goes before Section 5 under all circumstances, Section 7 must be determined before Section 5 is operable." Tr. at 38.

## ARGUMENT

**I.     THE BANKRUPTCY COURT EXCEEDED ITS AUTHORITY AND IMPROPERLY PREJUDICED GFCC'S RIGHTS.**

By adjudicating the merits of disputed issues in a summary proceeding, the bankruptcy court exceeded its authority. The bankruptcy court's factual findings and legal conclusions also wrongfully prejudiced GFCC's separate and independent claim. This court should vacate the decision below and remand so that the Northwest-BAE Stipulation may be considered under the appropriate standard of a settlement hearing, and so that GFCC's claim against Northwest may receive proper adjudication in its own contested proceeding.

**A.     A Settlement Hearing Is a Summary Proceeding.**

Federal bankruptcy law allows a debtor in possession to compromise and settle claims, subject to the bankruptcy court's approval. Fed. R. Bankr. P. 9019(a). The policy of encouraging settlements serves to expedite bankruptcy proceedings by disposing of claims that do not require the time and expense of full-dress litigation.

Accordingly, consideration of a proposed settlement is only a summary proceeding. The bankruptcy court's inquiry is limited to assessing whether the settlement is "fair and equitable," *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968), and in the estate's "best interests," *In re Energy Co-op., Inc.*, 886 F.2d 921, 927 (7th Cir. 1989). Its task is simply to "canvass the issues and see whether the settlement 'falls[s] below the lowest point in the range of reasonableness.' " *In re W.T. Grant & Co.*, 699 F.2d 599, 608 (2d Cir. 1983) (Friendly, J.) (citation omitted), *cert. denied sub nom.*, 464 U.S. 822 (1983).

Because the point of settlement is that it is *in lieu* of adjudication, the bankruptcy court does not "scrutinize the merits of compromises." *TMT Trailer*, 390 U.S. at 424. *See also Saylor*

8

*v. Lindsley*, 456 F.2d 896, 904 (2d Cir. 1972) (Friendly, C.J.) (court reviewing settlement must "avoid any actual determination of the merits" on underlying disputes) (citation omitted). "[S]ince '[t]he very purpose of a compromise is to avoid the trial of sharply disputed issues and to dispense with wasteful litigation', the court must not turn the settlement hearing 'into a trial or a rehearsal of the trial.'" *Id.* (citation omitted).

If the court's canvassing of issues reveals disputed questions of fact or law which are beyond the authority of the settling parties to compromise, those questions must be resolved in a proper contested proceeding. *See In re Orion Pictures Corp.*, 4 F.3d 1095, 1098-99 (2d Cir. 1993) (vacating approval of a motion to assume because the bankruptcy court improperly decided a disputed contract issue in a summary proceeding); *Copeland v. Merrill Lynch & Co., Inc.*, 47 F.3d 1415, 1423 (5th Cir. 1995) (noting the different policies and evidentiary standards between settlement proceedings and litigation of an actual claim). Such a contested proceeding would protect basic due process rights provided for in federal bankruptcy law to conduct discovery and present evidence. *See* Fed. R. Bankr. P. 9014.

The mere fact that a third party objects to a settlement does not convert a settlement hearing into an adjudicatory proceeding on the factual and legal questions in dispute. *W.T. Grant*, 699 F.2d at 608 (where objectants have challenged a settlement, "we emphasize that [the] responsibility of the bankruptcy court … is not to decide the numerous questions of law and facts raised by [the objectants] but rather to canvass the issues and see whether the settlement 'fall[s] below the lowest point in the range of reasonableness'") (citation omitted). *See also Orion*, 4 F.3d at 1098-99.

**B.    The Bankruptcy Court Improperly Adjudicated the Merits of GFCC's Claim.**

In spite of this well settled understanding about the limited scope of a settlement proceeding, the bankruptcy court in this case went far beyond its narrow mandate.[5]  As a result, the court violated GFCC's right to have its TIA claim adjudicated under proper procedure and a correct standard of evidence.  In a contested proceeding, GFCC would have a full opportunity to take discovery and present evidence to demonstrate that its interpretation of the operative documents is the correct reading.  As one appellate court has explained, a bankruptcy court's review of a proposed settlement "is a different inquiry, driven by different policies, than litigation of the actual claim."  *Merrill Lynch*, 47 F.3d at 1423.  "Such a determination is a far cry from the preponderance of the evidence standard [the debtor] would face in federal district court."  *Id.*

Instead of simply evaluating whether the Northwest-BAE settlement was "fair and equitable," *TMT Trailer*, 390 U.S. at 424, the bankruptcy court allowed Northwest to use the settlement proceeding to short-circuit proper consideration of GFCC's *separate and independent* claim.  To cure the bankruptcy court's error, this Court should vacate approval of the Stipulation, remand for consideration under the proper standard, and require that any settlement expressly preserve GFCC's rights and claims.  If Northwest seeks to avoid the possibility of double payment – that is, overpaying BAE by an amount it rightfully owes to GFCC – it may not rely on backdoor stratagems.  Rather, it must file a proper objection to GFCC's proof of claim, *see* Fed. R. Bankr. P. 3007, and commence a contested proceeding, *see* Fed. R. Bankr. P.  9014.[6]

---

[5]  The bankruptcy court never set forth, either at the hearing or in its decision, any findings regarding its authority, the scope of the proceeding, or an applicable standard of proof.

[6]  As a matter of due process, every bankruptcy creditor is entitled to know whether its claim is subject to an objection and the specific grounds for that objection.  *See* Fed. R. Bankr. P. 3007.

####     1.     Northwest Improperly Sought to Use Its Settlement Hearing With BAE to Adjudicate GFCC's Separate Claim.

The proposed Stipulation provided that Northwest's settlement of BAE's claim would "constitute[] full payment and discharge of Stipulated Loss Value." Stip. ¶ 2. The stipulation also provided that the allowed claim given to BAE "shall not be subject to . . . any claims of any owner trustee or owner participant." *Id.* ¶ 1. In its objection, GFCC explained that the settlement was unreasonable because it failed to recognize that a portion of the claim the Stipulation sought to allow in favor of BAE actually belonged to GFCC under its TIAs with Northwest and must be treated separately. GFCC Obj. at 9-11. In the alternative, GFCC suggested that the Northwest-BAE settlement could be approved if it included language to protect GFCC's rights. *See id.* at 15.

It was not until the settlement hearing that Northwest's objective in wording the Stipulation as it did actually was made explicit: to dispose of two separate claims – BAE's claim under the Leases and Indentures, and GFCC's claim under the TIAs – through the expedient of a single summary proceeding. Northwest's counsel told the court that "it must … decide[] today whether [GFCC is] owed any amount under the tax indemnification agreement." Tr. at 11. Later in the hearing, counsel elaborated,

> Your honor . . . let me be clear. We believe that if the stipulation is approved as written, that it necessarily implies that no payments are due under the TIA, and that that would be collateral estoppel in litigation on [GFCC's TIA] claim. That's certainly the position we would take.
> . . .
> As a technical matter, we're here to approve the stipulation, but we are certainly going to argue that an order approving the stip forecloses a payment to [GFCC] under the TIA. I just want to be clear about that.

---

The *prima facie* effect of a proof of claim cannot be overcome without providing a specific objection. *See In re Burkett*, 329 B.R. 820, 832 (Bankr. S.D. Ohio 2005) ("[T]he substantive basis for [an] objection must be described clearly in the…objection.").

Tr. at 64-66.

The reference to "collateral estoppel" should have raised an immediate red flag for the bankruptcy court. By definition, a decision rendered through a summary proceeding where one party's claim is being *settled* cannot have preclusive effect in a subsequent proceeding where a different party's claim is being *adjudicated.* *See Merrill Lynch*, 47 F.3d at 1422-23 (explaining that a hearing on compromise of claims could not collaterally estop subsequent litigation over interpretation of a contract, because "even when both suits arise out of the same factual setting, collateral estoppel does not apply unless both suits involve application of the same legal standard"); *Orion*, 4 F.3d at 1099 (bankruptcy court's decision in a summary proceeding "will receive no collateral estoppel effect").

But not only did the bankruptcy court fail to admonish Northwest's misuse of the settlement hearing, it allowed Northwest to engage in unsupported conjecture about the meaning of disputed provisions in the TIA. For example, Northwest's counsel offered the theory – on the basis of no evidence – that the TIA governing Northwest's obligations to GFCC

> is really written backwards. Okay? It appears to state a broad indemnification, but it's really only intended to cover a very narrow set of events. The reason it is written the way it's written is because the parties did not want to have to try and specify in advance all of the narrow events that could cause a tax loss and not be events of default under the lease.

Tr. at 21-22.

Even more boldly, Northwest propounded the extraordinary argument – again, based on nothing more than its own counsel's unsupported assertion – that the TIA was not intended to cover the very situation in which Northwest finds itself: a bankruptcy.

> [W]hat they did was create a huge exception to the indemnification, and that huge exception is anything that is an event of default, that will require us to pay SLV; and thus, what appears to be a broad indemnification agreement really is a very narrow one, and intentionally so, because Section 5(c) [of the TIA], in its

unprominent, somewhat innocent-looking position, really is and is intended to be a huge caveat on the indemnification obligation.

And the way the documents are supposed to work together is that only in those rare instances where an event has caused a tax loss, but is not an event of default under the lease, will the TIA actually require payment; otherwise, the tax benefit is always getting paid under the lease as part of SLV.

Tr. at 22.

In fact, nothing in the TIA or the other operative documents relieves Northwest of its obligations to GFCC in a default scenario – as GFCC explained both in its reply brief, *see* GFCC Reply at 5, and at the hearing.[7]  The sort of argument offered by Northwest – that a critical agreement governing the debtor's obligations actually means something different than what it says – might be appropriately offered in a contested proceeding, where it could be evaluated against testimony and other evidence.  But it was clearly improper in a summary proceeding.

### 2.    GFCC Objected to Having Critical Issues Concerning Its Own Claim Adjudicated in a Settlement Proceeding.

GFCC made clear that it objected to Northwest's effort to convert the Northwest-BAE settlement into a precedent that could foreclose GFCC's claim.  GFCC's counsel told the court,

I'm a little unsure, frankly, whether debtors are actually requesting this Court to adjudicate our claim, at this point in time. . . .  If so, I mean, I believe that we should be entitled to an evidentiary hearing on that.  There were some remarkable statements that the tax indemnity agreement was written backwards and so on.

---

[7]  As GFCC's counsel explained,

[T]he way the debtors and the lenders in this case are reading this . . . they might as well put a stamp on the cover of the [TIA] saying: No obligations created hereunder if the lessee is in default.  That is not the intention of the parties, I don't think it could be fairly read to be the intention of the parties to sign an agreement that has – goes on for pages and pages, a very complex agreement, and have it be completely inoperable once the lessee is in bankruptcy.  But that is the effect of their arguments.

Tr. at 55.

> I'm sure … testimony might be obtained to determine whether or not we really
> thought the tax indemnity agreement was written backwards.

Tr. at 37.

GFCC also emphasized that it had no interest in clouding the settlement

proceeding with disputed factual and legal questions; it simply sought to protect its right

to pursue its own claim in its own proceeding.  As GFCC's counsel explained,

> [I]f we're not here adjudicating our claim [but only] objecting to the stipulation,
> we're perfectly happy to do that, but I'd like to address some of the comments
> that were  made in regard to that, and I will be able to point out exactly what we
> think should be changed in the stipulation.

Tr. at 37-38.  *See also* GFCC Obj. at 9-11.  In any case, GFCC's third-party objection to the

Stipulation could not have converted the settlement hearing into a contested proceeding on

GFCC's separate and independent claim.  *Orion*, 4 F.3d at 1098-99; *W.T. Grant*, 699 F.2d at 608.

### 3.     The Bankruptcy Court Improperly Made Factual Findings and Legal Conclusions Relating to GFCC's Claim.

Despite GFCC's efforts to contain the settlement proceeding within proper limits, the

bankruptcy court improperly embarked on fact finding and drew substantive legal conclusions

about how the operative documents should be interpreted.

The bankruptcy court began by characterizing its decision as a "painstaking analysis" of

the TIA and its relationship to the other operative documents.  Dec. at 7.  This statement alone

demonstrates why the bankruptcy court's decision must be reversed: it is well settled that a

summary proceeding is not the proper setting for "painstaking analysis" of a contract

interpretation dispute.  *See, e.g., Orion*,  4 F.3d at 1098; *W.T. Grant*, 699 F.2d at 608; *Merrill

Lynch*, 47 F.3d at 1423.

The court then proceeded to interpret specific provisions of the TIA and other operative documents.  For example, it found that in a default scenario, any payment to GFCC for tax losses could only come through the "waterfall" provision of the Indenture, not directly by operation of the TIA or as an Excluded Payment. Dec. at 12.  It also concluded that "amounts are not payable or required to be paid under the TIA if they are within the exclusion of Section 5(c),"[8] *id.* at 13, and that satisfaction of SLV does not require that payment be made in full and in cash, *id*.  The court even interpreted the meaning of the absence of a comma in one provision of the TIA, *id*. at 14 – a quintessential exercise of contract interpretation.

On each of these critical points, the bankruptcy court expressly endorsed the position of Northwest and rejected the position GFCC made clear it would argue in its own proceeding on its TIA claim.  The court further stated that its ruling was based on what it called "the basic structure of the transaction," *id*. at 12 – a highly complex subject on which the court had received no evidence other than the operative documents themselves.

Turning to Northwest's "collateral estoppel" argument, the bankruptcy court said it would "not [be] appropriate for the debtors to contend that a decision on [the Stipulation] will invalidate GFCC's proofs of claim."  *Id*. at 16.  While the court said it was not dealing "directly" with GFCC's claim, *id*., the court clearly *did* decide the two underlying questions that would be pivotal in the adjudication of that claim: (1) it ruled that a payment of only partial SLV to BAE was sufficient, under Section 5(c) of the TIA, to allow Northwest to escape its tax indemnity obligation to GFCC; and (2) it ruled that the operative documents do not protect GFCC's right to recover the portion of SLV which represents GFCC's tax losses.  It also indicated that any future

---

[8]  Section 5(c) of the TIA relieves Northwest of its tax indemnity obligation to GFCC if Northwest has paid *full* SLV "in accordance with the provisions of the Operative Documents." TIA § 5(c).  We address the bankruptcy court's error on this point in Part II.B., *infra*.

adjudication of GFCC's claim would be limited to "elements . . . that do not include those tax losses that are a component of SLV." *Id.* These holdings clearly would prejudice GFCC in the litigation of its own claim – indeed, they essentially eliminate GFCC's claims.

The practical effect of the bankruptcy court's decision was to provide Northwest with what it expressly sought: a legal interpretation of the TIAs rendered without discovery, evidence, or the due process of a proper proceeding.

### 4.     The Bankruptcy Court's Decision Violated Clear Precedent.

The bankruptcy court's error in this case was comparable to (indeed, more egregious than) the bankruptcy decision overturned by the Second Circuit in *Orion*.

In that case, Orion sought to assume an executory contract with Showtime Networks pursuant to Section 365 of the Bankruptcy Code. Earlier, Showtime had threatened not to perform under the contract due to what it deemed as Orion's violation of a "key man" clause. On the same day as it filed its motion to assume, Orion filed an adversary proceeding claiming anticipatory breach by Showtime. In the course of approving Orion's assumption of the executory contract, the bankruptcy court also ruled in Orion's favor on the disputed key-man issue. Reasoning that the sole issue in the anticipatory breach action had been resolved, the bankruptcy court then dismissed the adversary proceeding.

The Second Circuit reversed, holding that the bankruptcy court had erred by deciding a disputed issue of contract law in a summary proceeding. *Orion*, 4 F.3d at 1098. It explained that a summary proceeding is "intended to efficiently review the trustee's or debtor's decision to adhere to or reject a particular contract in the course of the swift administration of the bankruptcy estate. It is not the time or place for prolonged discovery or a lengthy trial with disputed issues." *Id.* at 1098-99 (citations omitted).

In these circumstances, the Second Circuit held that the bankruptcy court's role is limited to providing its "business judgment" to determine whether it would be beneficial or burdensome for the estate to assume a contract. *Id.* at 1099. The "bankruptcy court sits as an overseer of the wisdom with which the bankruptcy estate's property is being managed . . . , and not, as it does in other circumstances, as the arbiter of disputes between creditors and the estate." *Id.* In exercising its business judgment, the bankruptcy court may *take note* of underlying disputed issues, but must leave their ultimate resolution to a "fact finder in an adversary proceeding." *Id.* "In such a case, the judge's wrong decision is simply an error of business judgment, not legal error." *Id.*

Similarly, in deciding whether to approve a settlement, the bankruptcy court's role is to evaluate the "wisdom of the proposed compromise," *TMT Trailer*, 390 U.S. at 424, and its "business justification," *In re Iridium Operating LLC*, 478 F.3d 452, 467 (2d Cir. 2007), while bearing in mind "the paramount interests of the creditors," *id.* at 462. The court may evaluate the "*probabilities* of ultimate success *should* the claim be litigated" rather than settled. *TMT Trailer*, 390 U.S. at 424 (emphasis added). But it may not, in the process, actually decide disputed questions. *W.T. Grant & Co.*, 699 F.2d at 608.

### C.    Regardless of Whether the Proposed Settlement Was Fair As to Northwest and BAE, It Was Unfair As to GFCC.

A bankruptcy court may not approve any provision of a settlement that would impair the rights of third parties. "Even if a settlement is fair and equitable to the parties to the settlement, approval is not appropriate if the rights of others who are not parties to the settlement will be unduly prejudiced." *In re Devon Capital Mgmt., Inc.*, 261 B.R. 619, 623 (Bankr. W.D. Pa. 2001) (approving a proposed settlement but deleting a provision that would have barred third parties

from asserting related claims).  Before approving a settlement, the bankruptcy court "must determine that 'no one has been set apart for unfair treatment.'"  *Id*. (quoting *Cullen v. Riley (In re Masters Mates and Pilots Pension Plan),* 957 F.2d 1020, 1026 (2d Cir. 1992)).  "Ignoring the effect of a settlement on rights of third parties 'contravenes a basic notion of fairness.'" *Id.* (*citing In re AWECO,* 725 F.2d 293, 298 (5th Cir. 1984)).

Regardless of whether the settlement approved by the bankruptcy court was fair on its face as to Northwest and BAE, by purporting to "constitute[] full payment and discharge of Stipulated Loss Value" and providing that the amount paid to BAE "shall not be subject to … any claims of any owner trustee or owner participant," the Stipulation prejudiced GFCC's rights and was thus unfair.

Even if this Court finds that the bankruptcy court did not exceed its authority by making factual findings and providing legal conclusions, it may affirm the settlement but must still preserve GFCC's third-party rights.  It could do so with a simple order specifying that the bankruptcy court's findings and conclusions concerning the operative documents shall have no bearing and constitute no authority in any subsequent contested proceeding on GFCC's claim.

## II.    THE BANKRUPTCY COURT ERRED IN ITS INTERPRETATION OF THE OPERATIVE DOCUMENTS.

The operative documents in this case are complex and, as the bankruptcy court proceeding revealed, their terms are subject to disputed interpretations.  For this reason, GFCC was entitled to litigate its own claim in its own proceeding, not a proceeding involving *settlement* of a *different creditor's* claim, and was entitled to the procedural rights federal bankruptcy law provides in a contested proceeding.

However, if this Court finds that the bankruptcy court did not exceed its authority by deciding disputed issues on the merits in a summary proceeding and did not violate third-party rights by approving a settlement that unfairly prejudiced GFCC's separate and independent claim, this Court should find that the bankruptcy court erred in its interpretation of the operative documents.

### A.     GFCC's Right to Tax Indemnification Was Not Part of the Collateral Pledged for BAE's Benefit.

The bankruptcy court apparently believed it had authority not only to approve a settlement between Northwest and BAE but *also* to decide GFCC's rights under the TIA, because it assumed that the TIA rights were part of the package of collateral that had been pledged to secure the debt. *See* Dec. at 12 (observing that in accordance with the "basic structure of the transaction," "stipulated loss value, *including the tax component*, is part of the package of security assigned to the indenture trustee for the benefit of the debt") (emphasis added). The bankruptcy court cited no authority from the operative documents for this crucial premise, but simply adopted the argument offered by Northwest and BAE. In fact, the premise was incorrect, and it led the bankruptcy court to provide an erroneous legal interpretation of GFCC's rights.

### 1.     GFCC Was Not a Party to the Indenture.

At the most basic level, GFCC could not have mortgaged away its rights under the TIA, because it was not a party to the Indenture. The parties to the Indenture were the Owner Trustee and the Indenture Trustee.  The relevant assets composing the Owner Trust – *i.e.*, the assets which the Owner Trustee had the power to pledge as collateral when it borrowed funds from BAE – were certain components of rent under the Leases, and the value of the aircraft

19

themselves.  *See* Indenture at 2.  Moreover, the Owner Trustee was not a party to the TIA, and thus had no power to mortgage any of GFCC's rights under that agreement.

The operative documents make abundantly clear that GFCC did not pledge its TIA claim as collateral for BAE's benefit.  For example, the granting clause of the Indentures expressly carves out certain Excluded Rights.  Indenture at 2.  An Excluded Right is defined as the right to receive an Excluded Payment.  Indenture at 7.  And Excluded Payments are defined, in turn, to include "*all payments required to be made under the Tax Indemnity Agreement by Lessee*," as well as rent payments "in respect of any amounts payable under the Tax Indemnity Agreement." Indenture at 6 (emphasis added).  Thus, the Indentures expressly exclude GFCC's TIA rights from the collateral pledged to secure the debt.

Consistent with this exclusion of GFCC's TIA rights from the collateral, the Indentures give GFCC the right, to the exclusion of the Indenture Trustee, to demand, collect, and enforce Excluded Payments.  Indenture at § 5.02(c)(V).  And both the Indentures and the Leases provide that if Excluded Payments are received by the Indenture Trustee, they must be paid over to the Owner Trustee for distribution to GFCC.  Indenture at § 3.05(b); Lease at § 3(e).

BAE concedes that SLV includes an amount representing GFCC's tax indemnity claim, *see* BAE Resp. at 5, yet BAE nonetheless demands to be awarded the entire amount of SLV. The only way to make sense of BAE's demand (and the bankruptcy court's decision) is to assume that GFCC pledged its right to tax indemnification as part of the collateral.  The operative documents make perfectly clear that GFCC did not do so, and thus Northwest and BAE had no authority to compromise that portion of SLV which is owed to GFCC under the TIA. The bankruptcy court erred in holding otherwise.

20

**2.    The Bankruptcy Court Confused GFCC's Equity Investment With GFCC's Separate Contractual Right to Tax Indemnification.**

The bankruptcy court also was mistaken in holding that GFCC could only recover its TIA claim through the SLV "waterfall" provided by the Indenture.  It is unexceptionable that, as the bankruptcy court observed, "debt usually comes before equity."  Dec. at 12.  But the bankruptcy court failed to understand the critical difference between the *equity investment* GFCC made to help purchase the aircraft, and the *tax benefits* to which GFCC was entitled as beneficial owner of the aircraft.

GFCC's pending TIA claim has nothing to do with recovering its equity investment. That equity investment was a contribution by GFCC to the Owner Trust, and was used by the Owner Trustee to help purchase the aircraft.  The planes clearly *were* pledged as collateral for BAE's benefit.  Indenture at 2.  Accordingly, GFCC does not dispute that the portion of SLV that represents its equity investment *would* be subject to the Indenture "waterfall," and would come later in priority of payment than the debt.

By contrast, GFCC's right to tax indemnification by Northwest represented an entirely separate and independent right, secured under a separate contract – the TIA.  As such, it could not conceivably flow through the waterfall; rather, it is subtracted from SLV before SLV is paid out to satisfy other claims, TIA § 7, or is paid to GFCC as an Excluded Payment, Indenture at § 3.05(b); Lease at § 3(e).  If tax indemnification were intended to simply flow through the waterfall, there obviously would be no need for a separate TIA.

As the leading treatise on leveraged leasing explains, carving out tax indemnification is fundamental to the nature of a leveraged lease transaction:

> The theory supporting these carve-outs is that, although the owner participant's *investment* is meant to be fully subordinated to that of the lender, both owner participants and lenders are passive investors in the leased asset.  Consequently,

> with respect to *out-of-pocket losses* suffered by the owner participant or owner
> trustee, they should be on a pari passu [*i.e.*, equal in priority] basis as far as
> unsecured indemnity claims against the lessee are concerned.

Ian Shrank, "Documentation," in *Leveraged Leasing* § 29:5.2[A] (emphasis added). *See also*

Mark A. Sternberg & Ross D. Taylor, "Leveraged Leasing from a Lender's Viewpoint," in

*Leveraged Leasing* at 8:5.2 ("Although the [lien] grant contained in the Indenture is intentionally

very broad and the assignment [of rent under the Lease] is an absolute present assignment, there

are standard exceptions thereto," including "compensatory" payments such as "indemnity

payments by the Lessee to the … Owner Participant.").

### 3. The Basic Economics of Leveraged Leasing Confirm That GFCC's Rights Under the TIAs Were Not Pledged for BAE's Benefit.

Tax implications are fundamental to the overall economics of leveraged leasing. William

A. Macan IV & Michael G. Robinson, "Tax Aspects of Equipment Leasing," in *Leveraged*

*Leasing* § 4:1 (noting that "tax considerations are paramount in the formulation and

implementation of the lease transaction").

Had Northwest purchased and held the planes itself, it would have been entitled under

federal tax law to deduct depreciation and interest on any related borrowings. Because the user

of capital equipment often is unable to use all the tax deductions to which it is entitled, in a

leveraged lease it essentially barters away its depreciation and interest deductions. In return, it

gets an important benefit: lower rent payments. *See id.* ("The fundamental tax objective of

leasing is the same worldwide: to provide a financing party (the lessor) with the right to claim

the tax benefits associated with … ownership …, so that those benefits can be shared with the

lessee through lower rent and other lease payments that reflect a 'borrowing' cost less than a

market interest rate.") (footnote omitted).

In other words, the tax benefits GFCC expected to receive in this case helped Northwest enjoy more favorable leasing terms. And this point underscores why the TIA only involves GFCC's rights against Northwest, and was not part of the collateral pledged for BAE's benefit under the Indenture. This basic economic bargain – swapping tax deductions for more favorable rent – is part of the incentive structure that makes leveraged leasing attractive to the airline, but it has nothing to do with actually acquiring the aircraft or securing the loans. The rent reduction was borne solely by GFCC, not the Lender; the Lender's investment was protected by (a) the equity invested by GFCC, (b) a requirement (fundamental to leveraged leases) that basic rent be set at an amount sufficient to pay debt service, and (c) the Lender's right to foreclose on the aircraft in the event of default. While obviously an integral part of the overall transaction, the TIA was a distinct contractual agreement designed to serve a distinct purpose. It was never pledged for anyone else's benefit.

In light of this understanding of the Indenture, the difference between GFCC's equity investment and its expected tax benefits, and the basic economics of leveraged leasing, the bankruptcy court erred in holding that GFCC's claim against Northwest under the TIA was "part of the package of security assigned to the indenture trustee for the benefit of the debt." Dec. at 12. This holding must be rejected.

### B. Northwest's Payment of a Compromised Amount in Settlement With BAE Does Not Eliminate its TIA Obligation to GFCC.

Section 5(c) of the TIA relieves Northwest of its tax indemnity obligation to GFCC if Northwest has paid SLV "in accordance with the provisions of the Operative Documents." TIA § 5(c). Because Northwest *will not* pay SLV "in accordance with the provisions of the Operative Documents," the bankruptcy court erred in finding that Section 5(c) applied in this case.

Section 5(c) is designed to protect Northwest from a risk of double payment. As described at 4, *supra*, SLV includes an amount equal to the Owner Participant's lost tax benefits. Thus, the rationale behind Section 5(c) is that if Northwest has indeed paid *full* SLV "in accordance with the provisions of the Operative Documents," such an amount would already include GFCC's tax indemnity, and Northwest should not have to pay that indemnity twice. In such a case, the Indenture Trustee would be required to disgorge and pay over the tax portion of SLV to the Owner Trustee for payment to GFCC. Indenture at § 3.05(b); Lease at § 3(e).

The operative documents set forth a specific mechanism for calculating SLV. But under its proposed Stipulation, this is *not* the amount of SLV Northwest will pay. Instead, it will pay an amount which Northwest and BAE *have deemed* to be "full payment and discharge of Stipulated Loss Value," Stip. ¶ 2, solely *for purposes of their settlement*.

By holding that Northwest is not required to pay SLV *in full* in order to satisfy Section 5(c), the bankruptcy court effectively rendered the TIA a nullity in any case of default by Northwest. Although it is true, as the bankruptcy court observed, that bankruptcy claims are rarely likely to be paid in full, *see* Dec. at 14, it is also true that GFCC, as a sophisticated equity investor, understood this reality. Since a full payment of SLV by Northwest would be necessary for GFCC to recover its lost tax benefits, GFCC logically would not have agreed to excuse Northwest of its TIA obligations in a scenario where Northwest has paid only *partial* SLV.[9] Yet the bankruptcy court's interpretation means that regardless of whether Northwest pays 100%, 99%, or 1% of actual SLV to the Lender, GFCC's TIA claim is extinguished. Such an outcome defies common sense, ignores the precise wording of Section 5(c) of the TIA, and effectively stamps the TIA with the disclaimer, "Not applicable in case of bankruptcy by the lessee."

---

[9]  In a contested proceeding on its TIA claim, GFCC would support this point with fact evidence.

The bankruptcy court also erred in holding that the analysis of a similar paid-in-full argument in *In re Delta Air Lines, Inc.*, 370 B.R. 552 (Bankr. S.D.N.Y. 2007) applied to this case. *See* Dec. 13-14. In *Delta*, Judge Hardin found that the airline was excused of its tax indemnity obligation by making a payment of only partial SLV, precisely because the agreements at issue in that case allowed for such an outcome: under a provision of the TIA in that case, the airline's tax indemnity obligation was excused by payment of SLV "*or an amount determined by reference thereto*." *Delta*, 370 B.R. at 562. In other words, Judge Hardin found that the actual language of the TIA in *Delta* contemplated the likelihood of only partial payment in bankruptcy.

By contrast, the TIA in this case contains no such language. Simply put, paying *some of SLV* is not the same as *paying SLV*. Because Northwest will not pay full, actual SLV as that term is understood in the operative documents, its proposed settlement with BAE in no way relieves it of its separate obligation to GFCC. While Northwest and BAE are free to agree on an amount that would settle BAE's claim, they are not free to unilaterally rewrite the operative documents to change critical terms and impair the rights of other parties.

## <u>CONCLUSION</u>

In view of the foregoing, GFCC respectfully requests that this Court vacate the bankruptcy court's approval of the Northwest-BAE Stipulation. In the alternative, this Court should enter an order specifying that the bankruptcy court's factual findings and legal conclusions concerning the operative documents shall have no bearing and constitute no authority in any subsequent proceeding on GFCC's claim.

Dated: September 28, 2007          By:     <u>s/ Andrew H. Schapiro</u>
                                           Andrew H. Schapiro
                                           David F. Abbott
                                           MAYER BROWN LLP
                                           1675 Broadway
                                           New York, NY  10019
                                           212-506-2500

                                           Stephen Sanders
                                           MAYER BROWN LLP
                                           71 S. Wacker Drive
                                           Chicago, IL  60606
                                           312-701-8464

                                           *Counsel for Appellant*
                                           *General Foods Credit Corp.*

<u>**CERTIFICATE OF SERVICE**</u>

Stephen Sanders, an attorney, hereby certifies that on the 28th day of September 2007, he caused to be served, via email and facsimile, a true and correct copy of the **BRIEF OF APPELLANT GENERAL FOODS CREDIT CORP**. upon (i) Bruce R. Zirinsky, Esq. (bruce.zirinsky@cwt.com), Barry J. Dichter, Esq. (barry.dichter@cwt.com) and Nathan A. Haynes, Esq. (nathan.haynes@cwt.com) FAX: 212.504.6666; (ii) Mark C. Ellenberg, Esq. (mark.ellenberg@cwt.com) FAX: 202.862.2400; (iii) Ken Coleman, Esq. (ken.coleman@allenovery.com) FAX: 212.610.6399; and (iv) Jeanne P. Darcey, Esq. (jdarcey@eapdlaw.com) FAX: 617.227.4420.

Dated: September 28, 2007                                         /s/ Stephen Sanders

                                                                                 Stephen Sanders