**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------x

In re                                             :          Chapter 11
                                                  :
**NORTHWEST AIRLINES CORPORATION,** *et al.*,     :          **Case No. 05-17930 (ALG)**
                                                  :
    Reorganized Debtors.                          :          **Jointly Administered**
                                                  :
                                                  :
------------------------------------------------------------------x
                                                  :
**GENERAL FOODS CREDIT CORP.,**                   :          **District Court**
                                                  :
    Appellant                                     :          **Case No. 07-CV-7940 (SAS)**
                                                  :
        v.                                        :
                                                  :
**NORTHWEST AIRLINES, INC.,**                     :          **ORAL ARGUMENT**
                                                  :          **REQUESTED**
    Appellee                                      :
                                                  :
------------------------------------------------------------------x


<u>**BRIEF OF APPELLEE NORTHWEST AIRLINES, INC.**</u>

## <u>TABLE OF CONTENTS</u>

STATEMENT OF ISSUES PRESENTED.....................................................................3

STANDARD OF APPELLATE REVIEW..................................................................4

STATEMENT OF THE CASE...................................................................................4

SUMMARY OF THE ARGUMENT .......................................................................16

ARGUMENT ..........................................................................................................17

    I.    THE BANKRUPTCY COURT CORRECTLY INTERPRETED THE OPERATIVE DOCUMENTS. ...............................................................17

        A.    The Bankruptcy Court Properly Interpreted the Contracts in Accordance with Their Plain Meaning. ....................................17

        B.    The Bankruptcy Court Did Not Assume That GFCC's Rights Under the TIA Were Pledged. ................................................23

        C.    The Plain Language of the Agreements Requires That If SLV Is Paid, GFCC Must Only Receive Its Tax Indemnification (If Any) Through the Waterfall. ................................................25

    II.    THE BANKRUPTCY COURT DID NOT EXCEED ITS AUTHORITY IN APPROVING THE STIPULATION............................................26

        A.    The Hearing on the Stipulation was a Core Proceeding and a Contested Matter Providing Full Procedural Protections to GFCC...........26

        B.    Standards Governing Bankruptcy Court Approval of a Compromise ................................................................30

        C.    The Bankruptcy Court Properly Considered the Merits of GFCC's Objections in Considering Approval of the Stipulation............................32

        D.    The Stipulation is Not Unfair to GFCC. ....................................34

CONCLUSION.......................................................................................................37

# **TABLE OF AUTHORITIES**

## **Federal Cases**

*Am. Can. Co. v. Herpel (In re Jackson Brewing Co.)In re Jackson Brewing Co.,*
624 F.2d 605 (5th Cir. 1980) ....................................................................30

*In re Boss-Linco Lines, Inc.*, 55 B.R. 299 (Bankr. W.D.N.Y. 1985)................................26

*Burford v. Dist. Dir., Dallas Dist., IRS (In re Burford)*, 231 B.R. 913 (Bankr.
N.D. Tex. 1999) ..........................................................................................22

*Cosoff v. Rodman (In re W.T. Grant Co.)*, 699 F.2d 599 (2d Cir. 1983)....................32, 33

*Cruden v. Bank of New York*, 957 F.2d 961 (2d Cir. 1992)................................................18

*Cullen v. Riley (In re Masters Mates and Pilots Pension Plan and IRAP Litig.),*
957 F.2d 1020 (2d Cir. 1992)......................................................................34

*In re Delta Air Lines, Inc.*, 370 B.R. 552 (Bankr. S.D.N.Y. 2007) ......................12, 14, 22

*In re Drexel Burnham Lambert Group, Inc.*, 960 F.2d 285 (2d Cir. 1992) ........................4

*Frito-Lay Inc. v. LTV Corp. (In re Chateaugay Corp.)*, 156 B.R. 391 (S.D.N.Y.
1993) ..............................................................................................................4

*Greenfield v. Philles Records, Inc.*, 98 N.Y.2d 562 (2002)................................................18

*Katchen v. Landy*, 382 U.S. 323 (1966)...............................................................................27

*In re Keck, Mahin & Cate*, 241 B.R. 583 (Bankr. N.D. Ill. 1999)..............................22, 23

*LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195 (2d Cir.
2005) ............................................................................................................18

*Liu v. Silverman (In re Liu)*, No. 98-5027, 1998 U.S.App. LEXIS 31698 (2d Cir.
Dec. 18, 1998)...............................................................................................4

*Martin v. Kane (In re A & C Properties)*, 784 F.2d 1377 (9th Cir.), <u>cert</u>. denied
<u>sub</u> <u>nom</u>. 479 U.S. 854 (1986) ....................................................................30

*Motorola Inc. v. Offic. Comm. of Unsecured Creditors (In re Iridium Operating
LLC)*, 478 F.3d 452 (2d Cir. 2007) .................................................. 4, 29-30

*N. Pipeline Const. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50 (1982)..........................26

*Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)*, 4 F.3d 1095 (2d Cir. 1993) ............................................................................27

*Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414 (1968) ..........................................................30, 31, 34

*In re Purofied Down Prods. Corp.*, 150 B.R. 519, 522 (S.D.N.Y. 1993)............................4

*In re Refco Inc.*, Docket No. 06-5786-bk (L) --- F.3d ----, 2007 WL 2893370 (2d Cir. Oct. 5, 2007) .................................................................29, 31, 34

*Sunbeam Prods., Inc. v. Wing Shing Products (BVI) Ltd.*, 311 B.R. 378 (S.D.N.Y. 2004) ............................................................................................................4

*U.S. v. Aweco, Inc. (In re AWECO Inc.)*, 725 F.2d 293 (5th Cir. 1984).....................33-35

*U.S. v. Whiting Pools, Inc.*, 462 U.S. 198 (1983) .............................................................26

*Walsh v. Hefren-Tillotson, Inc. (In re Devon Capital Mgmt., Inc.)*, 261 B.R. 619 (Bankr. W.D. Pa. 2001) ..............................................................................34

## Statutes

11 U.S.C. § 1141(d) ...........................................................................................................22

28 U.S.C. § 157(b)(1) .........................................................................................................26

28 U.S.C. § 157(b)(2) .........................................................................................................26

## Rules

Fed. R. Bankr. P. 9014................................................................................... 17, 26-28

Fed. R. Bankr. P. 9019................................................................................... 17, 26-29

## Treatises

Black's Law Dictionary 1165...............................................................................................22

Collier on Bankruptcy (15th Ed. Rev.) ¶ 9019.01 ...........................................................26

Northwest Airlines, Inc. ("Northwest"), as Appellee, respectfully asks the Court to affirm the Order of the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), approving a stipulation resolving claim nos. 10995, 10996, 10997, 10999 and 12216, relating to aircraft N513XJ, N514XJ, N515XJ, N516XJ, and N517XJ. The stipulation resolved the claims of U.S. Bank National Association ("U.S. Bank"), as Indenture Trustee, and BAE Systems (Funding One) Limited ("BAE"), as lender, for damages resulting from the rejection of leveraged leases relating to the five aircraft listed above. Because the leases provided that, upon an event such as rejection, Northwest was obligated to pay a scheduled amount called Stipulated Loss Value ("SLV"), mitigated by the fair market value of the returned aircraft, the stipulation provided for allowed claims in amounts determined by that formula. Appellant General Foods Credit Corporation ("GFCC") – the out-of-the-money owner-participant in the five rejected leveraged lease transactions – was the only party to object to the stipulation. GFCC agreed that the claims allowed to BAE should be calculated based on SLV, but asserted that Northwest had failed to reduce SLV by amounts due to GFCC under Tax Indemnity Agreements ("TIAs") related to the five transactions. As a consequence, according to GFCC, the claims being allowed to BAE were, collectively, some $30 million too large. GFCC further asserted that the plain language of the TIAs, the leveraged leases, and the other operative documents mandated the $30 million downward SLV adjustment. GFCC attached 135 pages of exhibits to its objection, including provisions of the operative documents. GFCC did not assert that the operative documents were ambiguous. It did not seek, or assert a need for, discovery. And it did not seek to, or assert a need to, call a witness. Northwest, similarly, did not assert that the contracts were ambiguous or that extrinsic evidence was necessary. Northwest, rather, contended that the operative documents, on their face, provided that no amounts were due under the TIAs and, accordingly, no reduction to SLV was called for.

One day after a two hour hearing during which it heard oral argument, the Bankruptcy Court rendered a decision approving the stipulation. The court carefully considered GFCC's reading of the relevant TIA, lease, and other provisions – and rejected that reading. The court concluded that, on their face, the unambiguous contract provisions provided that no indemnification was due under the TIA, that SLV, therefore, should not be reduced and that the allowed claim levels set forth in the stipulation were appropriate. Accordingly, the Bankruptcy Court approved the stipulation. Noting that GFCC's separate proof of claim based on the TIAs raised the same legal issue being decided with respect to GFCC's objection to the stipulation, the court stated, "[W]hile the decision today may be highly persuasive in the future, the Court cannot deal directly with GFCC's proof of claim, and the parties are free to argue as to the effect of this decision on such proof or proofs of claim." This appeal followed.

## JURISDICTION

This Court has jurisdiction pursuant to section 158(a)(1) of title 28 of the United States Code.

## ISSUES PRESENTED

1. Did the Bankruptcy Court err in concluding that no payment was due under five Tax Indemnity Agreements, when the agreements, by their own unambiguous terms, provided that Northwest would not be liable for any indemnification if an event occurred that caused SLV to be paid under the companion leveraged leases, and such an event had occurred?

2. Did the fact that GFCC's separate claim under the TIAs and GFCC's objection to the BAE stipulation presented a common legal issue (1) disable the Bankruptcy Court from deciding that legal issue, when the issue was central to GFCC's objection, and (2) disable the Bankruptcy Court from carefully reviewing the contract provisions GFCC expressly relied on to support its objection?

## STANDARD OF APPELLATE REVIEW

The Bankruptcy Court's interpretation of the plain meaning of the governing contracts is subject to *de novo* review.  Sunbeam Prods., Inc. v. Wing Shing Prods. (BVI) Ltd., 311 B.R. 378, 391 (S.D.N.Y. 2004); Frito-Lay Inc. v. LTV Corp. (In re Chateaugay Corp.), 156 B.R. 391 (S.D.N.Y. 1993).

The Bankruptcy Court's approval of the stipulation is reviewed for abuse of discretion.  Motorola Inc. v. Offic. Comm. of Unsecured Creditors (In re Iridium Operating LLC), 478 F.3d 452, 461 n.13 (2d Cir. 2007); In re Drexel Burnham Lambert Group, Inc., 960 F.2d 285, 292 (2d Cir. 1992).  A bankruptcy court's approval of a settlement should be reviewed "extremely deferentially."  Liu v. Silverman (In re Liu), No. 98-5027, 1998 U.S. App. LEXIS 31698, at *2 (2d Cir. Dec. 18, 1998) (per curiam).  The Bankruptcy Court's decision "should not be overturned unless its decision is manifestly erroneous and a clear abuse of discretion."  Id. (quoting In re Purofied Down Prods. Corp., 150 B.R. 519, 522 (S.D.N.Y. 1993)).

## STATEMENT OF THE CASE

### The Bankruptcy Cases

On September 14, 2005, Northwest, together with certain affiliates (the "Debtors"), filed with the Bankruptcy Court a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  On May 18, 2007, the Bankruptcy Court entered an order confirming the Debtors' First Amended Joint and Consolidated Plan of Reorganization Under Chapter 11 of the Bankruptcy Code.  The Effective Date of the Plan occurred on May 31, 2007.

As detailed in the Debtors' Disclosure Statement with respect to the Plan dated as of February 15, 2007 (Docket No. 4902), and amended as of March 30, 2007 (Docket No. 5726), holders of allowed general unsecured claims against the consolidated debtors (collectively,

Northwest Airlines Corp., Northwest Airlines Holdings Corporation, NWA Inc. and Northwest Airlines, Inc.) are projected to receive a recovery between 66% and 83% of their allowed claims, with a midpoint estimate of 74%. Disclosure Statement § V(B)(2).

**The Leveraged Lease Transactions**

           Prior to the commencement of its chapter 11 case, Northwest entered into leveraged lease transactions relating to the aircraft with U.S. Registration nos. N513XJ, N514XJ, N515XJ, N516XJ and N517XJ (the "GFCC Aircraft"). Northwest financed a significant portion of its aircraft fleet through leveraged lease transactions, a structure used by many other U.S. air carriers. Leveraged lease transactions, like those entered into by Northwest, typically include five parties: (i) an airline as "lessee" of the aircraft; (ii) an "owner trustee" that purchases and holds ownership of the aircraft in trust and leases the aircraft to the airline; (iii) an equity investor or "owner participant" that provides an equity contribution for the purchase of the beneficial interest in the owner trust; (iv) one or more lenders that provide debt financing to the owner trustee for the purchase of the aircraft; and (v) an "indenture trustee" that acts on behalf of the lenders. The owner trustee grants to the indenture trustee a mortgage on the aircraft, assigns to the indenture trustee substantially all of the owner trustee's interest and rights in the aircraft, and pledges to the indenture trustee all rights under the aircraft lease. The parties enter into a constellation of interlocking agreements detailing the entire transaction.

           With respect to the GFCC Aircraft, the agreements forming the leveraged lease transactions include, among others:

- Five separate Lease Agreements with respect to each of the GFCC Aircraft, each dated September 28, 1999, between First Security Bank, National Association as Lessor (and Owner Trustee) and Northwest as Lessee, each with substantively similar terms (each a "Lease").

- Five separate Trust Indenture and Security Agreements with respect to each of the GFCC Aircraft, each dated September 28, 1999, among First

Security Bank, National Association as Owner Trustee and State Street Bank and Trust Company as Indenture Trustee, each with substantively similar terms (each a "Trust Indenture"). U.S. Bank National Association is successor Indenture Trustee with respect to each of the GFCC Aircraft.

- Five separate Participation Agreements with respect to each of the GFCC Aircraft, each dated September 28, 1999, among Northwest as Lessee, GFCC as Owner Participant, Trident Jet (Dublin) Limited as Loan Participant, First Security Bank, National Association as Owner Trustee and State Street Bank and Trust Company in its individual capacity and as Indenture Trustee, each with substantively similar terms (each a "Participation Agreement"). BAE is successor Loan Participant with respect to each of the GFCC Aircraft.

- Five separate Tax Indemnity Agreements with respect to each of the GFCC Aircraft, each dated September 28, 1999, between Northwest and GFCC, each with substantively similar terms (each a "TIA"; together with the Lease, the Trust Indenture and the Participation Agreement, the "Transaction Documents")[1].

Leveraged lease transactions provide benefits to both lessees and owner participants. Historically, air carriers have not been able to utilize fully the tax benefits (primarily accelerated depreciation) available to owners of aircraft. In a leveraged lease, the owner participant becomes the owner of the aircraft for federal income tax purposes. The owner participant may then use the tax benefits received as the owner of the aircraft to defer its own tax liability incurred with respect to other activities. A portion of these tax benefits are reflected in the rent payable under the lease, thereby providing a benefit to the air carrier.

In a typical leveraged lease transaction – and in the GFCC transactions – the lease provides for the payment by the lessee of "stipulated loss value" if the leases are terminated prior to their scheduled expiration. Termination may result from a casualty event that destroys the

---

[1] A copy of a set of Transaction Documents is contained in the record transmitted by the Bankruptcy Court, at Exhibits A through D of the <u>Reorganized Debtors' Response to Objection of General Foods Credit Corporation To Stipulation Resolving Claim Nos. 10995, 10996, 10997, 10999, 11001, 11002, 11003, 11004, 12216 and 12217, relating to Aircraft N513XJ, N514XJ, N515XJ, N516XJ, N517XJ, N518XJ, N519XJ, N520XJ, N521XJ and N522XJ</u> dated July 16, 2007 (Docket no. 7337).

aircraft or from events of default. Parties typically calculate SLV by reference to a schedule attached to the lease that lists either dollar amounts to be paid or SLV percentages that are multiplied by a fixed number (such as the lessor's cost) to generate the dollar amount of SLV. SLV typically serves to (i) permit the payoff of the remaining debt, and (ii) to allow the owner participant to earn an agreed-upon return through the date of termination. The calculation of SLV takes account of, among other things, the adverse tax consequences to the owner participant from the premature termination of the lease or other events. That is, while SLV is expressed as a unitary number, a component embedded within it is equal to the amount of the reduced tax benefits available to the owner participant.

To protect the owner participant against a loss of the anticipated tax benefits resulting from certain actions of the lessee, the lessee and the owner participant typically enter into a tax indemnity agreement. Under the TIAs for each of the GFCC Aircraft, Northwest does not incur an indemnification obligation until, at minimum, the Owner Participant (GFCC) suffers a "Loss." A "Loss" is defined generally as the Owner Participant not having a claim for, suffering a disallowance of, or being required to recapture, certain tax benefits (including depreciation) as a result of certain acts or omissions of the Lessee.

However, certain events that result in a "Loss" under the TIA are also lease events of default that result in early termination of the Lease. For those events, as noted above, the Lease requires that Lessee pay SLV to the Lessor. Because SLV has embedded within it the value of the tax benefits, and because the Owner Participant would suffer a Loss, as defined by the TIAs, in the exact same amount, Northwest would be exposed to potential double liability for the tax benefits. To protect Northwest, as lessee, against double liability for the tax-related amounts, the TIAs carve out of the obligation to indemnify those events requiring Northwest to pay full SLV under the Leases. Specifically, Section 5(c) of each TIA states:

> SECTION 5.    Exceptions to Federal Tax Indemnification.
> Notwithstanding anything to the contrary in this Agreement,
> Lessee shall not be required to indemnify Owner Participant with
> respect to a Loss or Foreign Tax Credit Loss to the extent such
> Loss or Foreign Tax Credit Loss occurs as a direct result of one or
> more of the following events: . . .
>
> (c)      Any event as a result of which Lessee or any other person
> has paid Stipulated Loss Value or Termination Value, or paid the
> amount required to be the greater of the fair market value of the
> Aircraft and Stipulated Loss Value or Termination Value in
> accordance with the provisions of the Operative Documents except
> to the extent that such payment does not reflect the timing of the
> occurrence for Federal income tax purposes. . . .

TIA p. 20-21.

There are also instances where the Owner Participant suffers a Loss (as defined in the TIAs) due to actions of Northwest, but those actions would not be an event of default under the Lease and, accordingly, would not obligate Northwest to pay SLV under the Lease.  For example:  Northwest might not use the aircraft in the United States for a sufficient number of days within a year; Northwest might purchase all of the debt for a given aircraft and claim to be the owner of the aircraft for tax purposes; or the plane could be leased to a tax exempt entity. TIA p. 9-11, Section 3.  In these instances, the TIA obligates Northwest to indemnify GFCC for the Loss.  To insure that Northwest would not be exposed to double payment of tax-related amounts when these payments under the TIA occur, the TIAs (and corresponding Lease provisions) provide that SLV under the leases will be reduced to reflect the payments made under the TIA.  Thus, Section 7 of each TIA states:

> SECTION 7.    Adjustment of Stipulated Loss Values, Termination
> Values and Special Purchase Price.  If any amount is required to be
> paid by Lessee under Section 4 hereof, Owner Participant will
> recompute the Stipulated Loss Value percentages and Termination
> Value percentages and Special Purchase Price with respect to the
> Aircraft to reflect such payment in accordance with the manner in
> which such values were originally computed, or adjusted pursuant
> to Section 3 of the Lease, by Owner Participant, and shall certify to

lessee either that such values as set forth in the Lease do not require change or, as the case may be, the new values necessary to reflect the foregoing recomputation, describing in reasonable detail the basis for computing such new values, and upon such certification such new values shall be substituted for the values appearing in the Lease.

TIA p. 31.

## The Claims and Proposed Stipulation Settling the Claims

Pursuant to an agreement among Northwest, BAE and the Indenture Trustee dated February 24, 2006, and approved by the Bankruptcy Court by order dated March 7, 2006, Northwest rejected the leveraged leases for each of the GFCC Aircraft and for five other aircraft with respect to which BAE was the lender.  The agreement left the rejection damages claims unliquidated.   BAE and the Indenture Trustee filed claims for damages resulting from the rejection of the ten leases.

On May 17, 2007, the Debtors, BAE and the Indenture Trustee filed the stipulation.[2]  As originally presented to the Bankruptcy Court, the stipulation resolved the claims of the Indenture Trustee and BAE for damages resulting from the rejection of all ten aircraft leases.  Because the Leases provide that, upon an event such as rejection, Northwest is obligated to pay SLV (as determined by a schedule), mitigated by the fair market value of the returned aircraft, the stipulation provided for allowed claims in amounts determined by that formula.  To make clear that the stipulation discharged all of Northwest's obligations under the rejected leases, the stipulation provides that the allowance of the claims "constitutes full payment and discharge of Stipulated Loss Value with respect to each Prepetition Lease as required pursuant to

---

[2] Stipulation Resolving Claim Nos. 10995, 10996, 10997, 10999, 11001, 11002, 11003, 11004, 12216, and 12217 Relating To Aircraft N513XJ, N514XJ, N515XJ, N516XJ, N517XJ, N518XJ, N519XJ, N520XJ, N521XJ, and N522XJ dated May 16, 2007 (herein "Stipulation"), filed with Notice of Presentment dated May 17, 2007 (Docket no. 6933).

the relevant Prepetition Leases and other Operative Documents." Stipulation ¶ 2. Similarly, to protect BAE, the stipulation provided that the allowed claims "shall not be subject to subordination, reduction or adjustment in connection with any claims of any owner trustee or owner participant, or otherwise limited." Stipulation ¶ 1.

**GFCC's Objection to the Stipulation**

On June 29, 2007, GFCC filed a timely objection to that portion of the stipulation relating to the five GFCC aircraft.[3] GFCC objected on two grounds. Objection ¶ 1. First, GFCC asserted that the claims allowed under the stipulation as to the GFCC Aircraft overpaid BAE by $30 million. As stated by GFCC,

> [B]y proposing to give BAE an allowed claim of approximately $68 million with respect to the GFCC Aircraft, the Debtors have failed to give effect to *contractual provisions* in the GFCC leveraged lease agreements that require BAE's claims to be reduced by amounts that are owed to GFCC under tax indemnity agreements between GFCC and Northwest, which amount to approximately $30 million. *By failing to take these provisions into account, the Debtors' Stipulation proposes to "overpay" BAE by $30 million.*

Id. (emphasis added).

In particular, GFCC contended that Northwest was obligated to pay GFCC under the TIAs, and that Section 7 of the TIAs required the reduction of SLV (and the claims allowed therefor) on account of such obligation. Objection ¶¶ 14-17. GFCC stated that Section 5(c) of the TIAs, which would relieve Northwest from paying GFCC under the TIAs, was inapplicable, because Northwest would not be paying SLV in cash, but, rather, by the issuance of common

---

[3] Objection of General Foods Credit Corporation to Northwest Airlines Corporation's Stipulation Resolving Claims Nos. 10995, 10996, 10997, 10999, 11001, 11002, 11003, 11004, 12216 and 12217 Relating to Aircraft N513XJ, N514XJ, N515XJ, N516XJ, N517XJ, N518XJ, N519XJ, N520XJ, N521XJ, and N522XJ dated June 29, 2007 (Docket no. 7270) (herein "Objection").

stock under Northwest's Plan.  Objection ¶ 22.  GFCC asserted that, in each of these respects, the contracts were unambiguous: "[T]he Operative Documents unmistakably require that SLV be reduced to take into account amounts that are owed to GFCC under the TIAs."  Objection ¶ 15. GFCC attached 135 pages of exhibits, largely consisting of provisions from the Operative Documents, in support of the Objection.

In addition to objecting to the amount of the claims allowed under the stipulation, GFCC objected that "language included in the Stipulation could be construed as improperly prejudicing GFCC's claims or limiting its contractual rights against BAE and others."  Objection ¶ 2.  In particular, GFCC objected to language in paragraph 2 of the stipulation that states, "Allowance of the Allowed Claims plus the fair market value with respect to each relevant aircraft constitutes full payment and discharge of Stipulated Loss Value with respect to each Prepetition Lease as required pursuant to the relevant Prepetition Leases and the other Operative Documents."  GFCC asserted that the statement is "flatly wrong" because "SLV is not being paid in full" and "in cash in accordance with the Operative Documents" under the stipulation, and that the language may prejudice GFCC's own claims under the TIA.  Objection ¶¶ 24, 25.  GFCC also objected to language in paragraph 1 of the stipulation stating that the allowed claims "shall not be subject to subordination, reduction or adjustment in connection with any claims of any owner trustee or owner participant, or otherwise limited."  GFCC asserted that such language "attempts to take away GFCC's rights against the Indenture Trustee and BAE."  Objection ¶ 12. GFCC requested either rejection of the stipulation, or that the Bankruptcy Court add language "expressly providing (i) that it shall have no affect [sic] whatsoever, whether factual or legal, on the allowance or enforcement of GFCC's tax indemnity claims, and (ii) that GFCC's rights and claims against the Indenture Trustee, BAE and other parties to the Operative Documents are fully preserved."  Objection p. 15.

In setting forth its objections, GFCC did not state that there existed a genuine dispute as to any material fact. It did not state that it required discovery. It did not state that it needed to, or intended to, call a witness at the hearing on the stipulation.

In accordance with the applicable procedures implemented by the Bankruptcy Court with respect to the settlement of claims in the Northwest case, Northwest, GFCC, BAE and the Indenture Trustee entered into that certain <u>Stipulation and Order</u> dated June 29, 2007, establishing a briefing schedule with respect to GFCC's objection and setting a hearing date. (Docket No. 7265). Pursuant to that procedural stipulation, Northwest and BAE filed briefs responding to GFCC's objection, and GFCC filed a reply brief. Among other things, Northwest noted that virtually identical issues had just been decided by the Bankruptcy Court in the Delta Airlines Corporation chapter 11 case, and that application of <u>Delta</u> to the GFCC TIAs required a ruling in Northwest's favor. <u>See In re Delta Air Lines, Inc.</u>, 370 B.R. 552 (Bankr. S.D.N.Y. 2007) ("<u>Delta</u>"). In its reply, GFCC repeated the same two objections set forth in its initial Objection. In this regard, GFCC once again asserted that the objection should be decided on the plain language of the unambiguous Operative Documents. As stated by GFCC, "Two interrelated provisions of the TIAs are at the heart of this dispute. The first is section 7. . . . The second provision is Section 5(c) of the TIAs, which frees Northwest from it obligations to GFCC under the TIAs, but only if Northwest first 'has paid' SLV 'in accordance with the provisions of the Operative Documents.'" GFCC Reply ¶ 1.[4] GFCC did not assert that a material fact was in dispute, seek discovery, or state an intention to call a witness.

---

[4] <u>Reply Of General Foods Credit Corporation With Respect To Stipulation Resolving Claim Nos. 10995, 10996, 10997, 10999,11001, 11002,11003, 11004, 12216, and 12217 Relating To Aircraft N513XJ, N514XJ, N515XJ, N516XJ, N517XJ, N518XJ, N519XJ, N520XJ, N521XJ, and N522XJ dated July 23, 2007</u> (Docket no. 7437) (herein "GFCC Reply").

At the hearing on the GFCC Objection, all parties agreed that the stipulation could be bifurcated.   Transcript of Hearing Before the Honorable Allan L. Gropper United States Bankruptcy Judge, dated July 26, 2007 (herein "Hearing Tr.") at 8:2-19 (Docket no. 4751). Accordingly, an order was entered approving the stipulated claims with respect to the five rejected leases as to which no other objections were filed and in which there was an owner participant other than GFCC.   The Bankruptcy Court then entertained two hours of argument with respect to the five leases subject to the Objection.   During the hearing, GFCC did not tender a witness.   GFCC did utilize a demonstrative exhibit, comparing key provisions of the TIAs to the tax indemnity agreements at issue in <u>Delta</u>.   Hearing Tr. at 38:24-39:5.   GFCC handed out copies of this demonstrative to the court and other parties.   At the conclusion of the hearing, the Bankruptcy Court took the matter under advisement.

**<u>The Bankruptcy Court's Decision</u>**

On July 27, 2007, the Bankruptcy Court rendered a decision approving the stipulation with respect to the GFCC Aircraft and overruling the GFCC objection.   After describing the recent decision in <u>Delta</u>, the Bankruptcy Court stated, "All agree that the dispute should be resolved by careful examination of the applicable agreements.   We, accordingly, start with the same proposition that guided the <u>Delta</u> court:  That the rights of the parties should be determined by a painstaking analysis of the agreements at issue."  Decision p. 7.[5]

The Bankruptcy Court ultimately concluded, "based on the plain meaning of the parties' agreements . . .", that the TIAs did not require a reduction of SLV.  Decision p. 15.  The Bankruptcy Court found that Section 5(c) of the TIAs relieved Northwest from an obligation to

---

[5] Transcript of telephonic proceedings before Honorable Judge Gropper, dated July 27, 2007 (Docket no. 7491) (herein "Decision").

indemnify GFCC under the TIAs, and, thus, that the requirement in Section 7 of the TIAs to reduce SLV was not applicable. In considering GFCC's argument that Section 7 trumps Section 5(c), the Bankruptcy Court concluded that (i) Section 5 has primacy because it expressly applies "notwithstanding anything to the contrary" in the agreement (Decision p. 11); (ii) GFCC's interpretation "stretches the language 'required to be paid' beyond the breaking point" (Id.); (iii) GFCC's interpretation "would lead to a result that is at odds with the basic structure of the transaction" established by the agreements, including the Trust Indentures (Decision p. 12), and (iv) any intention to reduce an amount to be paid to the debt on account of a claim by equity "would have to be clearly expressed in the applicable contracts" (Id.)

In considering GFCC's further argument that Section 5(c) does not apply because SLV will be paid as an unsecured claim under Northwest's Plan, rather than in cash in full, the Bankruptcy Court found that the word "pays" does not mean "paid in cash," but instead "'must be construed in such a manner as to comport with the meaning of payment in the context of bankruptcy, which the parties expressly contemplated in the TIA, as well as in the other agreements. There is rarely likely to be full payment of claims in bankruptcy; and, in the ordinary course of any Chapter 11 case, payment of claims under a plan may be in cash or equity or debt securities of the debtor, or a combination of cash and securities.'" Decision p. 13-14 (quoting Delta at 562). Further, the Bankruptcy Court noted that the agreements elsewhere state that certain payments must be made in cash, but that Section 5(c) does not. Decision p. 14.

In considering GFCC's argument that the words, "in accordance with the provisions of the Operative Documents" in Section 5(c) requires payment of SLV in cash, the Bankruptcy Court found that the plainest reading of Section 5(c) is that the words do not modify the term "SLV," because they are part of a phrase that is set off from the remainder of the section. Decision p. 14. In addition, the Bankruptcy Court found that GFCC's interpretation

misconstrues the words "in accordance with the provisions of the Operative Documents," as "Operative Documents" includes at least fifteen separate documents, which do not require payment in all cases in cash, in full, and that the words "in accordance with the provisions of the Operative Documents" cannot be limited to this meaning. Rather, the proofs of claim that have been accorded to BAE and the Indenture Trustee are "in accordance with the provisions of the Operative Documents." Thus, the Bankruptcy Court concluded that, based on the plain meaning of the agreements, GFCC's objections to the settlement must be overruled.

With regard to GFCC's objections to specific language in the stipulation, the Bankruptcy Court found that the statement, "Allowance of the Allowed Claims plus the fair market value with respect to each relevant aircraft constitutes full payment and discharge of Stipulated Loss Value with respect to each Prepetition Lease as required pursuant to the relevant Prepetition Leases and the other Operative Documents," settles any possible claims against Northwest from the debt, and is consistent with its rulings. Decision p. 15-16.

With regard to GFCC's objection to the statement that the allowed claims "shall not be subject to subordination, reduction or adjustment in connection with any claims of any owner trustee or owner participant, or otherwise limited," on the grounds that it attempts to take away GFCC's rights against third parties, the Bankruptcy Court found that "there is nothing in the stipulation that purports to bar any claims or constitute an injunction." Decision p. 17.

Finally, in consideration of GFCC's request that the Bankruptcy Court add language to the Stipulation regarding its effect on GFCC's claims under the TIAs and against third parties, the Bankruptcy Court carefully considered the procedural posture of the matter, and the scope of the stipulation. The Bankruptcy Court noted, "It is not appropriate for the debtors to contend that a decision on this motion will invalidate GFCC's proofs of claim. . . . [T]he Court cannot deal directly with GFCC's proof of claim, and the parties are free to argue as to the effect

of this decision on such proof or proofs of claim." Decision p. 16-17. Accordingly, the Bankruptcy Court declined to add the language requested by GFCC as unnecessary, as well as inappropriate. Id.

## SUMMARY OF THE ARGUMENT

The Bankruptcy Court's determination that the SLV amount used to calculate the BAE claims should not be reduced because no amounts were payable under the TIAs was clearly correct. At the threshold, the court properly determined the intent of the parties from the unambiguous language of the Operative Documents. Neither GFCC nor Northwest advocated reliance on extrinsic evidence, and the court found no need for extrinsic evidence. Turning to the language of the documents themselves, particularly sections 5(c) and 7 of the TIAs, the Bankruptcy Court properly determined that section 5(c) excused Northwest from indemnifying GFCC's tax loss under the TIA. Section 5(c) applied because rejection of the leases constituted an event causing SLV to be paid under the leveraged leases, and the claims allowed to BAE clearly were based on SLV. GFCC's assertion that section 5(c) required payment in full, in cash, not payment by allowed claim, clashes with the plain language of the Operative Documents. GFCC's position also clashes with long-standing bankruptcy authority establishing that allowance of a claim is the equivalent of payment in full. Finally, because section 5(c) excused any indemnification obligation under the TIAs, there was no SLV adjustment to be made under section 7.

GFCC's procedural arguments crumble under even the lightest scrutiny. Having extensively briefed and argued the meaning of the TIAs as the basis for its objection to approval of the BAE claim stipulation, GFCC cannot now complain that the Bankruptcy Court actually interpreted the TIA. Moreover, having asserted repeatedly that the Operative Documents were unambiguous, having failed to attempt, or even to assert a need for, discovery, and having failed

to tender, or even to assert a need to tender, a witness, GFCC cannot now complain that it was deprived of discovery and an opportunity to present evidence. Moreover, GFCC's critical premise, that the hearing on the stipulation was a "summary proceeding" that permitted neither discovery nor testimony, is manifestly incorrect. The settlement approval was governed by Bankruptcy Rule 9019. The filing of an objection to the settlement initiated a contested matter under Rule 9014, which provides the full panoply of discovery mechanisms and allows for a trial type hearing. GFCC's additional complaint that the Bankruptcy Court improperly denied its separate TIA claim is contradicted by the plain language of the decision. And GFCC's assertion that the Bankruptcy Court erred by being "painstaking" is nothing short of remarkable. A court may be reversed for doing too little to analyze objections to a settlement, but no court has ever been reversed for doing too thorough a job. GFCC's real complaint is that they lost. That, no doubt, was prejudicial, but it was duly – not unduly – prejudicial.

## ARGUMENT

I.   **THE BANKRUPTCY COURT CORRECTLY INTERPRETED THE OPERATIVE DOCUMENTS.**

A.   **The Bankruptcy Court Properly Interpreted the Contracts in Accordance with Their Plain Meaning.**

As observed by the Bankruptcy Court, all parties agreed that the dispute should be resolved by careful examination of the applicable agreements. Decision p. 7. At no time did any of the parties assert that the contracts were ambiguous. In its Objection, GFCC urged that its interpretation of the contracts was "unmistakabl[e]." Objection ¶ 15. And GFCC pursued this

position with vigor at the hearing, focusing its argument on the demonstrative exhibit containing excerpts from the Northwest and Delta TIAs. [6]

Under New York law, unambiguous contracts must be interpreted in accordance with their plain meaning.[7]  The New York Court of Appeals has explained: "The fundamental, neutral precept of contract interpretation is that agreements are construed in accord with the parties' intent.  The best evidence of what parties to a written agreement intend is what they say in their writing.  Thus, a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms."  Greenfield v. Philles Records, Inc., 98 N.Y.2d 562, 569 (2002) (citations and quotations omitted).  Further, a contract "should be construed so as to give full meaning and effect to all of its provisions."  LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp., 424 F.3d 195, 206 (2d Cir. 2005) (citations and quotations omitted).  In interpreting contract terms, "the entire contract must be considered, and all parts of it reconciled, if possible, in order to avoid an inconsistency."  Cruden v. Bank of New York, 957 F.2d 961, 976 (2d Cir. 1992) (citations and quotations omitted).

The Bankruptcy Court's reading of the contracts could not be more straightforward.  As GFCC itself stated, the issue before the court turned on the interplay between sections 7 and 5(c) of the TIAs.  See page 12, supra.  Section 7 requires a reduction in SLV payable under the lease, but only to the extent that Northwest is obligated to make payments to GFCC under the TIA.  Section 5 of the TIA creates exceptions to the general

---

[6] While GFCC accuses Northwest of arguing that the TIA "actually means something different than what it says", the transcript excerpts quoted by GFCC to support the accusation prove exactly the opposite.  See Brief of Appellant General Foods Credit Corp. (herein "GFCC Brief") p. 12-13.  Northwest asserted in the selected excerpts, and at all other times, that the intent of the parties was apparent from the plain language of the documents, and the Court so ruled.

[7] The TIAs are governed by New York law.  See TIA p. 32, Section 10.

obligation to indemnify in the event of loss.    Specifically, section 5(c) provides that, notwithstanding that GFCC may have suffered a tax loss, Northwest shall not be liable for any indemnification upon the occurrence of an "event as a result of which Lessee or any other person has paid Stipulated Loss Value or Termination Value . . . ."    Rejection of the leases was, indisputably, an event that resulted in SLV being due and payable under the leases.    Accordingly, Northwest was compelled to pay SLV (mitigated by the value of the returned aircraft) to the Indenture Trustee, for the benefit of BAE.    The obligation represented by BAE's allowed claim, thus, clearly fulfills the requirement of section 5(c), and excuses Northwest from its obligation to indemnify GFCC for its tax loss under the TIAs.

Since no amount is owing under the TIAs, due to the operation of section 5(c), no adjustment to SLV is required by Section 7.    In this manner, section 5(c) protects Northwest from being liable both for the tax component embedded in SLV and for indemnification of the same amount under the TIAs.    GFCC's suggestions to the contrary notwithstanding, extinguishment of liability under the TIA's does not extinguish GFCC's rights to recover lost tax benefits.    The extent to which GFCC actually will recover its tax loss depends on the extent to which the proceeds of the allowed claims exceed the amount necessary to pay off the debt to BAE and to pay other amounts ahead of GFCC in the indenture waterfall.    Depending on the amount and value of the shares ultimately distributed on the BAE claims, GFCC may receive nothing with respect to the tax loss, it may receive partial payment, or it may receive almost full payment. [8]

---

[8] The actual value of the distribution on allowed unsecured claims has not been determined.    The final results will depend on (1) Northwest's success in eliminating or reducing disputed claims and (2) the market value of Northwest common stock on various future distribution dates.    As noted above, the Disclosure Statement projects a recovery range of 66% to 83%, but those are just estimates.

While GFCC spends the first 23 pages of its brief obfuscating the Bankruptcy Court's decision – and avoiding the central legal issue in this case – its eventual discussion of the issue, starting at the bottom of page 23, serves only to demonstrate that the Bankruptcy Court's decision was correct.  First, GFCC concedes the essential point that section 5(c) is intended to protect Northwest from double liability for tax benefits under the leases and the TIAs.  As stated by GFCC,

> Section 5(c) is designed to protect Northwest from a risk of double payment.  As described at 4, *supra,* SLV includes an amount equal to the Owner Participant's lost tax benefits.  Thus, the rationale behind Section 5(c) is that if Northwest has indeed paid *full* SLV "in accordance with the provisions of the Operative Documents," such an amount would already include GFCC's tax indemnity, and Northwest should not have to pay that indemnity twice.  In such a case, the Indenture Trustee would be required to disgorge and pay over the tax portion of SLV to the Owner Trustee for payment to GFCC.

GFCC Brief p. 24.

There can be no question that the claims allowed to BAE under the stipulation (and under the leases) "include GFCC's tax indemnity."  Thus, were unsecured creditors receiving payment in full, there is no question that GFCC would receive its tax payments through the indenture waterfall and that, if Northwest also had an obligation to pay under the TIA, Northwest would "have to pay that indemnity twice."

GFCC seeks to evade the conceded plain meaning of section 5(c) with a single – and patently untenable – argument:  The fact that Northwest likely will not pay allowed claims of unsecured creditors in full precludes Section 5(c) from applying.  As stated by GFCC,

> Since a full payment of SLV by Northwest would be necessary for GFCC to recover its lost tax benefits, GFCC logically would not have agreed to excuse Northwest of its TIA obligations in a scenario where Northwest has paid only *partial* SLV.  Yet the bankruptcy court's interpretation means that regardless of whether

>Northwest pays 100%, 99%, or 1% of actual SLV to the Lender, GFCC's TIA claim is extinguished.

GFCC Brief p. 24 (footnote omitted).

This statement cannot withstand scrutiny. As GFCC admits in the first sentence, a 100% payment by Northwest would result in payment of full tax benefits to GFCC. The allowance of the claim to BAE does not amend the indentures in any way. BAE would be entitled only to be paid what it is owed. Any excess claim proceeds would flow through the indenture waterfall, ultimately to GFCC. Thus, even under GFCC's reading of the Operative Documents, the TIA claim would be extinguished by section 5(c), and properly so. Payment of 99% by Northwest to unsecured creditors would not result in full payment of tax benefits to GFCC, but it would result in some (and almost full) payment. If GFCC were able to obtain an allowed claim under the TIA for the full Loss, on the theory that section 5(c) did not apply, it would actually receive almost double payment of its tax loss. It would receive both the excess distribution on the BAE claim through the indenture waterfall and a 99% recovery on the separate TIA claim.

This example clearly demonstrates that the result sought by GFCC not only could undermine the clear – and admitted – intent of protecting Northwest from double liability under the TIA but, at least as importantly, would undermine basic bankruptcy precepts. All general unsecured creditors in a bankruptcy case are at risk for receiving less than full payment on their allowed claims. The most basic rule of bankruptcy is that all general unsecured creditors should share that loss on a *pro rata* basis. Because the TIA claim, by definition and by GFCC's admission, fully duplicates the tax component embedded in a claim for SLV, the result advocated by GFCC would distort the *pro rata* relationship among general unsecured claims. In essence, GFCC is seeking to avoid, or, at the least, minimize, absorbing its share of Northwest's putative

insolvency by doubling up its allowed claim. The result reached by the Bankruptcy Court preserves GFCC's ability to receive payment for lost tax benefits, but only after payment to senior claims under the indenture waterfall. This result, as the Bankruptcy Court noted, is fully consistent with the fact that GFCC agreed in the indenture to pledge all rights to payment under the lease, including SLV, to the Indenture Trustee, for the benefit of BAE.

Thus, it is not surprising that the Bankruptcy Court, like the <u>Delta</u> court when presented with the same issue, rejected GFCC's position. As both bankruptcy courts observed, the term "payment", in the context of bankruptcy, means the allowance in full of a claim, not payment in full of a claim. <u>See</u> page 14, *supra;* <u>see</u> <u>also</u> <u>Delta</u> at 562. Where the parties intended to require payment in full in cash, they expressly so stated. <u>See</u> <u>id</u>.

The conclusions of the Bankruptcy Court and the <u>Delta</u> court that a debt is fully paid in the context of bankruptcy once a claim is allowed are supported by a consistent line of authority in bankruptcy cases. Black's Law Dictionary defines the term "payment" as the "performance of an obligation by the delivery of money or some other valuable thing accepted in partial or full discharge of the obligation." <u>Black's Law Dictionary</u> 1165 (8th ed. 2004). Section 1141(d)(1) of the Bankruptcy Code generally provides that the confirmation of a plan discharges the debtor from debt that arose before the date of confirmation. 11 U.S.C. § 1141(d)(1). <u>See</u> <u>also</u> <u>Burford v. Dist. Dir., Dallas Dist., IRS (In re Burford)</u>, 231 B.R. 913, 916 (Bankr. N.D. Tex. 1999) (Plan confirmation relieves a debtor from obligations for debt that arose before the confirmation date.)

Similarly, in determining whether a self-insured retention ("SIR") must be paid before a debtor's insurance company is required to satisfy the remaining insurance obligation, the courts have concluded that allowance of a claim for the SIR, not payment in full on that claim, triggers the insurer's obligations. In <u>In re Keck, Mahin & Cate</u>, 241 B.R. 583 (Bankr.

N.D. Ill. 1999), the debtor had such an insurance policy, and its plan of reorganization granted to affected claimants an unsecured claim for the SIR portion of their recovery. The insurer asserted that the debtor was required to satisfy the SIR by the actual payment of the full amount on each claim before the insurer would be obliged to pay anything. The court held, however, that the SIR was satisfied by the plan's grant to affected creditors of an unsecured claim for the SIR. As stated by the court:

> The SIRs are to be satisfied in exactly the same way as every other unsecured claim against the Debtor. The policy condition to [the insurer's] liability that the Debtor "pay" costs and amounts due on the claim "as they become due" up to the amount of the SIR will be satisfied under the Plan. An obligation to pay is satisfied when something of value is given and accepted in full discharge of that obligation.

Id. at 596 (citing Black's Law Dictionary 1150 (7th ed. 1999)). Thus, the allowance of a claim for SLV constitutes payment of full SLV.

**B.    The Bankruptcy Court Did Not Assume That GFCC's Rights Under the TIA Were Pledged.**

Creating a straw-man based on a manifest distortion of the decision below, GFCC accuses the Bankruptcy Court of incorrectly presuming that GFCC's rights under the TIA were pledged to secure the BAE debt. GFCC Brief p. 19-20. Neither Northwest nor BAE ever asserted that GFCC's rights under the TIA were pledged to secure the debt, nor was such a premise part of the Bankruptcy Court's decision. Rather, the Bankruptcy Court found, based solely upon the plain meaning of the contracts, that Section 5(c) of the TIA excuses Northwest from any liability under the TIA in the facts and circumstances of this case. GFCC's assertion that the Bankruptcy Court presumed rights to payment under the TIA are pledged is incompatible with the finding that there was no right to payment under the TIA.

The Bankruptcy Court actually said, "[S]tipulated loss value, including the tax component, is part of a package of security assigned to the indenture trustee for the benefit of the debt." Decision p. 12. The statement is unquestionably correct. Under the Lease, the Owner Trustee and Northwest agree that "Lessor has agreed in the Trust Indenture . . . to assign to the Indenture Trustee this Lease and to mortgage its interest in the Aircraft in favor of the Indenture Trustee. . . . Lessee agrees to pay directly to the Indenture Trustee . . . all amounts of Rent [which is defined to include SLV] due or to become due hereunder and assigned by to the Indenture Trustee . . . ." Lease § 20.[9] In the "Granting Clause" of the Trust Indenture, the Owner Trustee assigns to the Indenture Trustee its rights under the Lease. Trust Indenture p. 1-2. As correctly noted by GFCC, "Excluded Payments," which include "all payments required to be made under the Tax Indemnity Agreement by Lessee," were not assigned to the Indenture Trustee. GFCC Brief p. 20 (quoting the Trust Indenture p. 6). However, as found by the Bankruptcy Court, no such payments under the TIAs are required to be made in this case due to the application of Section 5(c). Decision p. 13.

GFCC's argument seeks to confuse the tax benefits embedded in SLV with the claims under the TIAs. The claims under the TIA are, to be sure, separate from the right to receive SLV under the leases, but they are also wholly duplicative of the tax component of SLV. It is precisely this redundancy that makes section 5(c) and section 7 of the TIA necessary. The claims under the TIAs are excluded from the Owner Trustee's pledges. But SLV, which is

---

[9] Additionally, under section 3(d)(v) of the Lease, Northwest Airlines and the Owner Trustee (which assigned all rights title and interest to Indenture Trustee) agreed that "each payment of Termination Value and SLV, whether or not adjusted in accordance with this section 3(d) shall . . . in each case be, under any circumstances and in any event, in an amount at least sufficient to pay in full, on the date on which such amount of Rent is due, any payments then required to be made on account of the principal of Funding Loss Amount, if any, and interest on the Secured Certificates . . . ." Lease § 3(d)(v).

always expressed as a unitary number, unquestionably is pledged.  The Bankruptcy Court did not

state that the TIA claims were pledged.  It did state, and properly so, that the pledge of SLV

buttressed the conclusion that section 5(c) eliminated indemnification under the TIAs, when an

event that triggers an obligation to pay SLV under the leases occurred.

> **C.    The Plain Language of the Agreements Requires That If SLV Is Paid, GFCC Must Only Receive Its Tax Indemnification (If Any) Through the Waterfall.**

GFCC attacks the Bankruptcy Court for holding that "GFCC could only recover

its TIA claim through the SLV 'waterfall' provided in the Indenture."  GFCC Brief p. 21.  In

fact, the Bankruptcy Court made no such holding.  The Bankruptcy Court actually said, "[T]he

waterfall contains provisions for payments to the debt before payments to the equity.  Payments

to the owner-trustee for any tax, expenses, or other losses come fourth in line after payment to

the debt holders to make them whole."  Decision p. 12.  This statement is demonstrably correct.

GFCC also asserts that the Bankruptcy Court confused GFCC's equity investment

with its tax benefits in finding that such amounts would flow through the waterfall.  GFCC Brief

p. 21.  GFCC argues that its right to tax indemnification is "an entirely separate and independent

right, secured under a separate contract—the TIA," and "as such, it could not conceivably flow

through the waterfall."  Id.  GFCC is correct that its rights to payment under the TIA do not flow

through the waterfall.  That is precisely why its rights under the TIA are extinguished if SLV is

paid pursuant to Section 5(c).  As recognized by the Bankruptcy Court, if an event occurs (such

as loss of the aircraft) as a result of which SLV is paid, GFCC's right to recover lost tax benefits

follows only after the debt is made whole.

GFCC further argues, disingenuously, that if tax indemnification were intended to

simply flow through the waterfall, there would be no need for a separate TIA.  GFCC Brief p. 21.

GFCC simply ignores the variety of circumstances where Northwest would have to indemnify

GFCC under the TIA, but an event of the type specified in Section 5(c) would not have occurred. See page 8, *supra*.  In each of these cases, Northwest would owe a payment under the TIAs, but would not be obligated to make a payment of SLV under the Leases.  In such cases, section 7 of the TIAs would operate, and SLV would be reduced by the payments under the TIA.

## II.     THE BANKRUPTCY COURT DID NOT EXCEED ITS AUTHORITY IN APPROVING THE STIPULATION.

### A.     The Hearing on the Stipulation was a Core Proceeding and a Contested Matter Providing Full Procedural Protections to GFCC.

The stipulation settled claims of BAE and the Indenture Trustee against Northwest's estate.  Without question, approval of the Stipulation was a core proceeding.  See 28 U.S.C. § 157(b)(2)(B) ("Core proceedings include, but are not limited to . . . allowance or disallowance of claims against the estate . . . .").  In a core proceeding, a Bankruptcy Judge may "hear and determine" the matter.  28 U.S.C. § 157(b)(1).

GFCC's procedural arguments depend entirely on the wholly unsupported premise that the Bankruptcy Court hearing on the stipulation was a "summary proceeding".  GFCC Brief p. 8.  GFCC cites no authority for this radical assertion.  Summary jurisdiction, and the "summary proceedings" conducted under it, were terms used to describe cases over which the bankruptcy court had exclusive jurisdiction under the old Bankruptcy Act.  In re Boss-Linco Lines, Inc., 55 B.R. 299, 303 n. 15 (Bankr. W.D.N.Y. 1985) (citing 2 Collier on Bankruptcy ¶ 23.02[1] (14th ed. 1976)).  The concept is inapplicable under the Bankruptcy Code.  As explained by the Supreme Court in U.S. v. Whiting Pools, Inc., 462 U.S. 198, 206 (1983), "[T]he new Bankruptcy Code abolished the distinction between summary and plenary jurisdiction." Id. (citing H.R. Rep. No. 95-595, pp. 48-49 (1977); N. Pipeline Constr. Co. v. Marathon Pipe Line Co., 458 U.S. 50, 53 (1982)).

Settlements of claims by or against a debtor are governed by Bankruptcy Rule 9019. An objection to a proposed Rule 9019 settlement initiates a contested matter, and the procedure is governed by Bankruptcy Rule 9014. <u>Collier on Bankruptcy</u> (15th Ed. Rev.) ¶ 9019.01. Rule 9014 makes available the entire panoply of discovery devices available in adversary proceedings. Among other things, Rule 26 and Rules 28-37 of the Federal Rules of Civil Procedure, as incorporated by Rule 7026 and Rules 7028-7037 of the Bankruptcy Rules, apply. <u>See</u> Bankruptcy Rule 9014 (c). Similarly applicable are Fed. R. Civ. P. 42, 52, 54, 55 and 56.

The only case cited by GFCC that contains the term "summary proceeding" is <u>Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)</u>, 4 F.3d 1095 (2d Cir. 1993) ("<u>Orion</u>"). <u>See</u> GFCC Brief p. 9, 16-17. At the threshold, <u>Orion</u> did not involve approval of a settlement under Rule 9019. Rather, it involved the approval of the assumption and assignment of a contract under section 365 of the Bankruptcy Code and a companion adversary proceeding filed by the debtor to obtain a declaratory judgment that the contract at issue had not been breached. The Bankruptcy Court concluded that the debtor should be permitted to assume and assign the contract, among other reasons, because the contract had not been breached. Accordingly, the Bankruptcy Court dismissed the adversary proceeding as moot. The United States Court of Appeals for the Second Circuit reversed the dismissal of the adversary proceeding on the ground that a finding made in the context of section 365 cannot apply in an adversary proceeding. The expressed concern of the Court of Appeals, however, was that, in the adversary proceeding, the nondebtor party was entitled to a trial by jury. <u>Orion</u>, 4 F.3d at 1099. GFCC, by contrast, does not have a right to trial by jury on its TIA claim. As the Supreme Court has made clear, a bankruptcy claim is inherently equitable in nature (regardless of the underlying legal rights giving rise to the claim) and, accordingly, does not afford jury trial

rights to the party asserting it.  Katchen v. Landy, 382 U.S. 323, 336-338 (1966).  Thus, Orion has no applicability here.  Moreover, the Orion Court never states that Rule 9014 does not apply in a "summary proceeding" or that discovery is not available.

Last, but hardly least, GFCC criticizes the Bankruptcy Court for doing more than it should have in a "summary proceeding", but never offers a clear statement of what the Bankruptcy Court was supposed to do in ruling on the stipulation.  GFCC says the Bankruptcy Court should not have decided its TIA claim, but, clearly, the court did not decide the TIA claim.  Decision p. 16-17.  The Bankruptcy Court decided, instead, the very objection that GFCC placed in front of it.  GFCC based that objection on the plain language of the Operative Documents.  There was no way for the court to address that objection without expressing a view on the contract provisions that GFCC, both literally and figuratively, thrust in the court's face.  GFCC suggests the Bankruptcy Court's error was in being "painstaking" when reviewing the Operative Documents.  GFCC Brief p. 14.  Northwest is not aware of any case in which a court was reversed on appeal for doing too thorough a job.  Certainly, GFCC cites none.

GFCC intimates, without any specificity, that the procedural posture of the matter denied it due process.  GFCC Brief p. 10.  But GFCC fails to identify a single right it would have in a hearing on an objection to its claim that was not available to it with respect to approval of the stipulation.[10]  Neither GFCC's objection nor its reply brief asserted that the contracts at issue were ambiguous, that discovery was necessary, or that the court needed to hear testimony.  Nor

---

[10] The deadline for objecting to disputed claims is November 27, 2007.  Northwest will file an objection to GFCC's claim prior to that date.

did GFCC request discovery when the scheduling stipulation was negotiated.  And GFCC did not attempt to tender a witness or present evidence at the hearing.[11]

Further, Rules 9019 and 9014 made available to GFCC every procedural protection that would be available to it in a hearing on an objection to its TIA claim, including discovery.  Indeed, Northwest and SNET, another owner participant objecting to a proposed settlement on the grounds that its TIA claim would be prejudiced, just entered into a stipulation that provides for discovery in connection with a hearing on the settlement of the indenture trustee's and lender's claims.  (The stipulation, as entered by the Bankruptcy Court, is attached to this brief as Exhibit A.)

GFCC also ignores that if Northwest had objected to its TIA claim before addressing BAE's claims, BAE would be in precisely the same position that GFCC now complains of.  GFCC labels Northwest's choice to proceed first with the BAE claim as a "backdoor stratagem" (GFCC Brief p. 10), but fails to consider that BAE has an exactly equal and opposite perspective.  The opposing perspectives are a necessary consequence of the fact that the claims are inextricably intertwined.  If Northwest's reading of the Operative Documents is correct, as the Bankruptcy Court found, all of SLV should be paid to BAE, without adjustment.  If GFCC's interpretation were correct, SLV, and the claims allowed to BAE, should be reduced.  There is no way to avoid the common legal issue, regardless of which claim is

---

[11] The statement of GFCC counsel at the hearing that he would put in testimony to rebut the "testimony" of Northwest's counsel was an isolated remark in the context of a two hour hearing during which GFCC focused entirely on the language of the TIAs.  See Hearing Tr. at 37:15-23; GFCC Brief p. 13-14. Moreover, as noted above (1) Northwest at no time suggested that the intention of the parties was different from that suggested by the plain language of the parties, (2) Northwest did not offer extrinsic evidence (argument of counsel is not evidence) and (3) the Bankruptcy Court did not rely on extrinsic evidence.

addressed first.  The essential point is that GFCC had a full opportunity to place its position before the court, regardless of which claim went first.

**B.    Standards Governing Bankruptcy Court Approval of a Compromise**

In the Second Circuit, the standard for approval of a settlement under Bankruptcy Rule 9019 is whether the compromise is "in the best interests of the debtors, the estates and their creditors."  In re Refco Inc., Docket No. 06-5786-bk(L) --- F.3d ----, 2007 WL 2893370, at *3 (2d Cir. Oct. 5, 2007) ("Refco").  In Iridium, the Court of Appeals identified several factors should be considered in determining the "best interests" test:

> (1) the balance between the litigation's possibility of success and the settlement's future benefits; (2) the likelihood of complex and protracted litigation, with its attendant expense, inconvenience, and delay, including the difficulty in collecting on the judgment; (3) the paramount interests of the creditors, including each affected class's relative benefits and the degree to which creditors either do not object to or affirmatively support the proposed settlement; (4) whether other parties in interest support the settlement; (5) the competency and experience of counsel supporting, and the experience and knowledge of the bankruptcy court judge reviewing, the settlement; (6) the nature and breadth of releases to be obtained by officers and directors; and (7) the extent to which the settlement is the product of arm's length bargaining.

Iridium, at 462.

Where the evidence on the issue of a compromise is thorough and comprehensive, and the court is familiar with the entire record and touches all material bases of any objections, the court's approval of a compromise does not constitute an abuse of discretion.  Martin v. Kane (In re A & C Properties), 784 F.2d 1377 (9th Cir. 1986), cert. denied sub nom. 479 U.S. 854 (1986); see also Am. Can. Co. v. Herpel (In re Jackson Brewing Co.), 624 F.2d 605 (5th Cir. 1980).

GFCC cites <u>Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc.</u> <u>v. Anderson</u>, 390 U.S. 414 (1968), as standing for the proposition that "the bankruptcy court's inquiry is limited to assessing whether the settlement is 'fair and equitable.'" GFCC Brief p. 8. <u>TMT</u> was decided under the Bankruptcy Act, not the current Bankruptcy Code. Moreover, it addressed compromises included in a plan of reorganization, not stand alone compromises presented to the bankruptcy court for approval. Even if applicable, however, <u>TMT</u> does not support the proposition for which GFCC cites it. Among other things, the Supreme Court held that "it is essential that every important determination in reorganization proceedings receive the 'informed, independent judgment' of the bankruptcy court," that the bankruptcy judge must "apprise[] himself of all facts necessary for an intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated," and that the judge "should form an educated estimate of the complexity, expense, and likely duration of such litigation, the possible difficulties of collecting on any judgment which might be obtained, and all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise." <u>TMT</u>, 390 U.S. at 424-425. GFCC further misrepresents <u>TMT</u> as holding that "the bankruptcy court does not 'scrutinize the merits of compromises.'" GFCC Brief p. 8. To the contrary, the Supreme Court stated, "*The fact that courts do not ordinarily* scrutinize the merits of compromises involved in suits between individual litigants *cannot affect the duty of a bankruptcy court to determine that a proposed compromise forming part of a reorganization plan is fair and equitable*," and "The requirements . . . that plans of reorganization be both 'fair and equitable,' apply to compromises just as to other aspects of reorganizations." <u>TMT</u>, 390 U.S. at 424 (emphasis added). GFCC's citations to other cases, allegedly standing for the proposition that the bankruptcy court's role is more limited than as expressed by the Supreme Court in <u>TMT</u> and by the Second Circuit Court of Appeals in <u>Iridium</u>, are no more faithful.

### C. The Bankruptcy Court Properly Considered the Merits of GFCC's Objections in Considering Approval of the Stipulation.

In considering the stipulation, in accordance with <u>Refco</u> and <u>Iridium</u>, the Bankruptcy Court was required to, among other things, apprise itself of all facts necessary for an intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated, and form an educated estimate of all factors relevant to a full and fair assessment of the wisdom of the proposed compromise. Upon GFCC's objections that the stipulation proposed to overpay BAE by $30 million in the $68 million settlement, and that the stipulation "is not a fair and reasonable settlement" (Objection ¶ 19), the Bankruptcy Court had a duty to evaluate the merits of GFCC's objections. As GFCC's assertions were based upon interpretation of the underlying transaction documents, the Bankruptcy Court was required to examine and consider the agreements sufficiently to form a full and fair assessment of the proposed settlement. The Bankruptcy Court had to analyze whether Section 5(c) or Section 7 of the TIA was controlling; had to consider all of the transaction documents as a whole to properly interpret the agreements under New York law; had to ascertain the plain meaning of the agreements; and had to evaluate each of GFCC's arguments against interpretation of the agreements in accordance with their plain meaning. Here, the Bankruptcy Court dutifully performed each of its responsibilities, appropriately.[12]

GFCC's relies on several cases suggesting that a bankruptcy court should "avoid any actual determination of the merits" and only "canvass the issues and see whether the

---

[12] Without the slightest hint of irony, GFCC states that the Bankruptcy Court's analysis of "the absence of a comma in one provision of the TIA" was beyond the proper scope of the hearing. GFCC Brief p. 15. GFCC fails to mention that the Court first addressed the role of the comma during GFCC's oral argument, when GFCC counsel was reviewing that very provision of the TIA and arguing that the plain language required that the stipulation not be approved. Hearing Tr. at 50:8-17. If the Bankruptcy Court failed to address this language, GFCC would no doubt be arguing that the Bankruptcy Court ignored the plain language of the TIAs.

settlement falls below the lowest point in the range of reasonableness." GFCC Brief p. 9. What GFCC fails to apprehend is that the appeals in these cases were taken by parties complaining that the Bankruptcy Court did not do enough. The decisions affirm the Bankruptcy Court's approvals as meeting minimum standards. The decisions in no way suggest that the Bankruptcy Court would have committed reversible error by doing more. Again, the notion that a court can be reversed on appeal for doing too much is bizarre, let alone unprecedented.

Examining one decision relied upon by GFCC, Cosoff v. Rodman (In re W.T. Grant Co.), 699 F.2d 599 (2d Cir. 1983) ("W.T. Grant"), is instructive. In W.T. Grant, a proposed settlement provided for the payment of a certain percentage of the claims of accepting subordinated debentureholders, and all rights of non-acceptors would be preserved. Id. at 605. Some of the debentureholders objected to the proposed settlement asserting, among other things, that claims of the settling counterparties (certain banks) should be equitably subordinated to the debentures, and that the bankruptcy trustee's counsel was subject to conflicts of interest which required disqualification. Id. With respect to the objectors' claims for equitable subordination of the banks' claims (which logically would have been settled as to accepting debentureholders in the settlement), the circuit court gave summary treatment to two arguments for which no evidence was provided. Id. at 610. With regard to two other arguments for which evidence was provided, the court carefully considered all of the materials submitted, the record, and other facts of the case. Id. at 610-611. Based on its review, the circuit court considered the issues presented and evaluated the likelihood for success on the equitable subordination claims, without ruling on the claims. Id. In contrast, with respect to the objecting debentureholder's assertion that counsel for the bankruptcy trustee held allegiances to the settling banks that would lead counsel to recommend too favorable a settlement to the banks, the circuit court reviewed each relationship charged by the objectors as disqualifying and specifically found that they were not. Id. at 612-

613.  Thus, rather than acting in a limited, passive capacity, as GFCC asserts is appropriate, the circuit court in W.T. Grant took an active role in fully evaluating the proposed compromise and the objections thereto, and made findings on the merits as necessary in fulfillment of its duties.

Another case cited by GFCC also demonstrates that the bankruptcy court must, at times, adjudicate factual or legal questions in connection with approving a settlement.  In U.S. v. Aweco, Inc. (In re AWECO Inc.), 725 F.2d 293 (5th Cir. 1984) ("AWECO"), the debtor proposed to enter into a settlement with a junior creditor that could prevent a senior creditor from being paid in full.  The circuit court ruled that prior to approving a settlement with a junior creditor, the bankruptcy court must first conclude that priority of payment will be respected as to objecting senior creditors.  Id. at 298.  The court noted that "important determinations in reorganization proceedings must receive the 'informed, independent judgment of the Bankruptcy Court.'"  Id. at 299 (quoting Protective Committee v. Anderson, 390 U.S. 414, 424 (1968)).  The court further held that "decisions as central to bankruptcy proceedings as approval of settlements cannot be visceral.  They must issue from reason and rest upon factual undergirdings."  Id. at 300.

### D.    The Stipulation is Not Unfair to GFCC.

GFCC asserts that a "bankruptcy court may not approve any provision of a settlement that would impair the rights of third parties."  GFCC Brief p. 17.  This vast overstatement finds no support in the case law.  Indeed, in Refco, the Second Circuit refused to consider the objections to a settlement of interest holders in a Cayman corporation who asserted that they were unduly prejudiced by a settlement agreed to by the management of the corporation.  Refco, supra.  As stated by the court, "[A] bankruptcy court's obligation is to determine whether a settlement is in the best interests of the estate, not to ensure that the creditors' representatives are honoring their fiduciary duties."  Id. at *7.

The cases relied on by GFCC do not suggest a different result.  Two of the cases concerned settlements that contained an injunction against third parties.  <u>Walsh v. Hefren-Tillotson, Inc. (In re Devon Capital Mgmt., Inc.)</u>, 261 B.R. 619, 623 (Bankr. W.D. Pa. 2001); <u>Cullen v. Riley (In re Masters Mates & Pilots Pension Plan and IRAP Litigation)</u>, 957 F.2d 1020, 1026 (2d Cir. 1992)).  The injunction against third parties was deemed unfair and unduly prejudicial to those third parties in those cases.  As the Bankruptcy Court here made clear in its decision, the stipulation does not contain an injunction against any action by GFCC.  Decision p. 17.  Accordingly, these cases are inapplicable.

The third case cited by GFCC is <u>In re AWECO</u>, *supra*.  As discussed above, <u>AWECO</u> concerned a proposed settlement with a junior creditor that could prevent the senior creditor from being paid in full.  For a settlement with a junior creditor, the court stated that a bankruptcy court should also conclude that priority of payment will be respected as to objecting senior creditors.  <u>AWECO</u>, 725 F.2d at 298.  As the stipulation here settles the claims of the senior creditors in the leveraged lease transactions, <u>AWECO</u> in no way supports GFCC's assertion that the stipulation is unfair to GFCC.

GFCC asserts that the stipulation may constitute an injunction by editing the language in a way that distorts its meaning.  GFCC represents the stipulation to provide that the amount paid to BAE "shall not be subject to . . . any claims of any owner trustee or owner participant" (GFCC Brief p. 18, quoting Stipulation ¶ 1; ellipses in GFCC Brief).  The provision actually says that the BAE claims "shall not be subject to subordination, reduction or adjustment in connection with any claims of any owner trustee or owner participant, or otherwise limited." Stipulation ¶ 1.  In short, the language does not restrict GFCC, but, rather, restricts Northwest from attempting to have the stipulated claims adjusted based on the ultimate disposition of GFCC's TIA claim.  Similarly, the stipulation provision that each allowed claim "constitutes full

payment and discharge of Stipulated Loss Value" (GFCC Brief p. 18, quoting Stipulation ¶ 2) protects Northwest from further claims under the Leases by BAE.  Accordingly, the language was found by the Bankruptcy Court to be an accurate statement of the facts.  As such, it is also not unfairly prejudicial to GFCC.

GFCC's real complaint is that the Bankruptcy Court's decision had the "practical effect" of denying GFCC's TIA claim.  GFCC Brief p. 16.  But there is nothing undue about that.  Such "practical effects" occur every time a court in a common law jurisdiction renders a decision.  One could say (and Northwest will say) that the Bankruptcy Court's approval of the BAE decision also effectively disposes of the identical objection of SNET with respect to a wholly different leveraged lease.  SNET will have its day in court, but it certainly cannot assert that the decision with respect to BAE's claims deprived it of due process.  GFCC's complaint is even less compelling, since it actually appeared and fully argued its view of the Operative Documents before the Bankruptcy Court ruled.

## CONCLUSION

For the reasons set forth above, the Bankruptcy Court's decision should be affirmed.

Dated:     New York, New York
           October 18, 2007

CADWALADER, WICKERSHAM & TAFT LLP

*/s/ Gregory M. Petrick*
Bruce R. Zirinsky (BZ 2990)
Gregory M. Petrick (GP 2175)
One World Financial Center
New York, New York  10281
Telephone:  (212) 504-6000
Facsimile:  (212) 504-6666

- and -

Mark C. Ellenberg (ME 6927)
1201 F Street N.W., Suite 1100
Washington, DC  20004
Telephone:  (202) 862-2200
Facsimile:  (202) 862-2400

Attorneys for Appellee Northwest Airlines, Inc.

# **<u>EXHIBIT A</u>**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------------X

In re

NORTHWEST AIRLINES CORPORATION, et al.,

               Debtors.

---------------------------------------------------------------------X

    :    **Chapter 11**
    :
    :    **Case No. 05-17930 (ALG)**
    :
    :    **Jointly Administered**
    :
    :

**AGREED SCHEDULING ORDER WITH RESPECT TO SNET CREDIT, INC.'S**
**OBJECTION TO STIPULATION AFFECTING AIRCRAFT N530US**

Upon the above-captioned reorganized debtors' (the "Debtors") presentment to the Court of the *Stipulation Resolving Claims 7888, 7889, 7890, 7615, 9787, 7614, 9788, 7613, 7608, 7610, 7611, 7612, 9327, 10633 and 10991 Relating to Aircraft N507US, N528US, N529US, N530US, N531US, N664US and Aircraft In NWA Trust No. 1 and NWA Trust No. 2 Transactions* filed on September 17, 2007 [Docket No. 7621] (the "Stipulation");[1] and SNET Credit, Inc.'s ("SNET") *Limited Objection and Reservation of Rights with Respect to the Stipulation Affecting N530US* filed on September 27, 2007 [Docket No. 7659] (the "Objection"); and the Debtors, ABN AMRO Bank N.V. ("ABN AMRO"), U.S. Bank National Association (the "Indenture Trustee") and SNET having negotiated and agreed upon a discovery and briefing schedule and a hearing date with respect to the Objection, all as more fully set forth below; and after due deliberation and sufficient cause appearing therefor

---

[1]    Capitalized terms used, but not otherwise defined, herein shall have the meanings assigned to them in the Stipulation.

IT IS HEREBY ORDERED AND AGREED THAT:

1.      The parties shall serve document requests and interrogatories, if any, so as to be actually received by October 17, 2007.

2.      Each of the parties shall respond to any document request or interrogatories by October 29, 2007.

3.      The parties shall serve deposition notices, if any, so as to be actually received by November 1, 2007.

4.      The parties shall make witnesses available for deposition at mutually agreeable dates and times between November 5, 2007 – November 13, 2007.

5.      The parties will exchange and file simultaneous briefs setting forth their respective positions on December 4, 2007.

6.      The parties will exchange and file simultaneous reply briefs by 5:00 p.m. on December 14, 2007.

7.      Subject to the Court's schedule, the evidentiary hearing on the Objection will be held on December 19, 2007 at 10:00 a.m.

8.      Documents may be served by electronic mail.

9.      The parties hereto agree to hold Confidential Information (as defined herein) confidential, and shall not share such information with any third party except as provided in Paragraph 10 herein, absent written consent of the Debtors, SNET, ABN AMRO and the Indenture Trustee, as applicable.

10.     The parties agree that they will use any and all Confidential Information solely in connection with resolution of the Stipulation, the Objection and SNET's and its affiliates' proofs of claim filed in these cases (collectively, the "Matters").  Disclosure of Confidential Information

may be made to (1) parties, and to directors, officers or employees of parties, or the directors, officers or employees of the parties' affiliates; (2) counsel to the parties and to counsel's employees and contractors (including contract lawyers and litigation support firms) retained by counsel; (3) consultants or experts employed or contracted by any party or counsel to any party to assist counsel in the preparation for the proceedings and in the proceedings; and (4) persons called to testify under oath in the context of a deposition in connection with the Matters, and to stenographers, videographers or other court reporters contracted to transcribe or record such depositions.  Confidential Information may be offered into evidence or otherwise referenced at any hearing on the Matters, provided that any party may request that the Court protect the confidentiality of any Confidential Information through a method mutually agreeable among the Debtors, SNET, ABN AMRO and the Indenture Trustee.  Confidential Information may be offered into evidence or otherwise referenced in any pleading or court papers filed in connection with the Matters (including, but not limited to, the briefs and reply briefs referenced above in Paragraphs 5 and 6 hereto), provided that the party filing such pleading shall file in redacted form any such court papers that disclose Confidential Information (with a complete copy of the pleading and its attachments delivered to chambers and served on the parties) or file such papers under seal, each subject to further order of the Court.  The parties are hereby authorized to file pleadings or court papers in connection with the Matters in redacted form or under seal to protect the disclosure of Confidential Information.

11.    "Confidential Information" shall include any settlement amounts, the Restructured Loan Documents, the Participation Agreement dated as of August 1, 1988 between Northwest, as Lessee, SNET, as Owner Participant, ABN AMRO, as Loan Participant, the First National Bank of Boston, as Owner Trustee, and the Connecticut Bank and Trust Company,

National Association, as Indenture Trustee (the "Participation Agreement") and the Operative

Documents (as defined in the Participation Agreement), any information redacted from the ABN

Term Sheet or the Claims as filed, the amount of the facility contemplated by the ABN Term

Sheet and the Restructured Loan Documents (including negotiations regarding the price at which

the Debtors acquired the Leased Aircraft and mortgaged the Collateral Aircraft), the maintenance

condition of the Leased Aircraft or Collateral Aircraft, and the negotiations regarding the

Stipulation (including, but not limited to, the method for deriving the amounts set forth in

Paragraph 1 thereto (the "Settlement Amounts"), and the components or calculations supporting

the Settlement Amounts).   Notwithstanding anything herein to the contrary, the parties to this

Stipulation reserve the right:  (i) to  designate other information not included in the definition of

"Confidential Information" herein as Confidential Information, and (ii) to object to any such

designation.  Documents to be designated as Confidential Information shall be so indicated by

the producing party by stamping the word "CONFIDENTIAL" on each such page.

12.    This Agreed Order may be executed in any number of counterparts and shall

constitute one agreement, binding upon all parties thereto as if all parties signed the same

document.  Facsimile signatures shall be treated as originals for all purposes.

Dated:  October 16, 2007

**CADWALADER, WICKERSHAM & TAFT LLP**

By:   _/s/ Mark C. Ellenberg_

Mark C. Ellenberg (ME 6927)
1201 F Street N.W., Suite 1100
Washington, DC  20004
Telephone:  (202) 862-2200
Facsimile:  (202) 862-2400

_Counsel for the Reorganized Debtors_

**WINSTON & STRAWN LLP**

By:   */s/ Mindy Cohn*

Daniel J. McGuire (DM 5529)
Mindy D. Cohn (MC 8870)
35 West Wacker Drive
Chicago, IL  60601
Telephone:  (312) 558-5600
Facsimile:  (312) 558-5700

*Counsel for SNET Credit, Inc.*

**MAYER BROWN LLP**


By:     */s/ Raniero D'Aversa, Jr.*
Raniero D'Aversa, Jr. (RD-9551)
1675 Broadway
New York, New York 10019
Telephone:  (212) 506-2500
Facsimile:  (212) 262-1910


*Attorneys for ABN AMRO Bank N.V.*

**EDWARDS ANGELL PALMER & DODGER LLP**


By:   */s/ Amy A. Zuccarello*
Richard Hiersteiner (RH 4976)
Jeanne P. Darcey (JD 9800)
Amy A. Zuccarello (AZ 2284)
111 Huntington Avenue
Boston, MA  02199
Telephone:  (617) 239-0100
Facsimile:  (617) 227-4420


*Attorneys for U.S. Bank National Association, not*
*in its individual capacity, but solely as Indenture*
*Trustee with respect to N530US*

So ordered this 18 day of October, 2007


     */s/ Allan L. Gropper*
Hon. Allan L. Gropper
United States Bankruptcy Judge